## APPEAL OF GOULD COUPLER CO.

Docket No. 791.    Decided November 16, 1926.

1. INVESTED CAPITAL; ASSETS ACQUIRED FOR STOCK; TIME OF VALUATION.—Two West Virginia corporations, organized prior to 1903, in that year owned tangible and intangible property, a part of which had been acquired for stock and the balance accumulated or developed in the course of their business operations. In 1903 they respectively transferred all of their property to two New York corporations, which also assumed the liabilities, for substantially all of the capital stock of the latter, the stock so received being distributed among the stockholders in exchange for their shares in the West Virginia corporations. *Held*, the invested capital of the New York corporations is to be measured by the value of the property at the time transferred to them for stock, and not by the cost to, or value at the time acquired by, their respective predecessors. *Appeal of Regal Shoe Co.*, 1 B. T. A. 896; *Appeal of National Bakers' Egg Co.*, 3 B. T. A. 1205.

2. SAME; INTANGIBLES; VALUATION.—Value of intangible property paid in for stock in 1903 determined.

3. SAME; LIMITATION ON VALUE; AFFILIATED CORPORATIONS.—In affiliations, the 25 per cent limitation prescribed by section 326(a) (4), (5), Revenue Act of 1918, upon the amount of intangibles that may be included in invested capital, shall be measured by the total outstanding capital stock of the affiliated group. This rule applies to both classes of affiliation.

4. SAME; OPERATING DEFICIT; AFFILIATED MEMBER.—In determining the consolidated invested capital of an affiliated group of corporations, the operating deficits of any member shall be offset against the earned surplus of the others; that is, only the net earned surplus of the group shall be included in invested capital.

5. SAME.—The operating losses of any member during the period of affiliation are deducted in determining the consolidated net income.

6. SAME; INTERCOMPANY OBLIGATIONS.—If one member of an affiliation makes advances to another to meet operating losses occurring during the period of affiliation, the intercompany obligation thus arising may not be deducted by the corporation making the advance after the obligation has become worthless.

7. SAME.—While affiliated, intercompany obligations are disregarded in determining the consolidated net income and invested capital.

8. SAME; PATENTS; COST OF DEVELOPMENT BY PREDECESSOR.—Expenditures for patent development made by a predecessor corporation are reflected in the value of patents acquired for stock by petitioner, and may not again be included in the invested capital of the latter.

9. SAME; CAPITALIZATION OF COST; EVIDENCE.—Evidence *held* insufficient to enable the Board to determine that expenditures for

patent acquisition and development, originally charged to profit and loss, should be added to surplus for determining invested capital.

10. DEPRECIATION.—Depreciation allowed on items of tangible assets erroneously omitted by petitioner in its original return.

*Richard T. Greene, Esq.*, and *James L. Dohr, Esq.*, for the petitioner.

*E. C. Lake, Esq.*, for the Commissioner.

The petitioner appeals from the determination of a deficiency of $202,104.65 in income and profits taxes for the years 1918 and 1919. It alleges error by the Commissioner, in excluding from invested capital the value of patents acquired for capital stock; in offsetting operating deficits of some affiliated companies against the surplus of other companies in the affiliated group in ascertaining invested capital of the group; in excluding from invested capital expenditures for development of patents; in using an incorrect capital sum in computing exhaustion, wear and tear and obsolescence; in disallowing the deduction in 1918 of intercompany losses occurring prior to 1918; and in disallowing the deduction of a loss arising through the stock of subsidiary corporations having become worthless.

FINDINGS OF FACT.

About 1884, Charles A. Gould started in the business of manufacturing and selling car axles, locomotive axles, locomotive frames and link-and-pin couplers for railroad equipment. In 1886 he acquired a patent for an automatic car coupler known as the " Barnes " patent. Shortly thereafter he acquired the so-called " Browning " patent covering an automatic coupler with a self-opening head. Up to this time the link-and-pin coupler was being used on the railroads of the United States. Gould obtained orders from certain railroad companies, including the New York Central, the Erie, and the Lackawanna, and commenced supplying automatic couplers to them, although continuing to make and to sell the link-and-pin couplers. To obtain orders it was necessary to secure the confidence of the railroads in automatic couplers, and Gould was enabled to do this because of the contacts he had made in selling his other products to them. There was another patent for an automatic coupler known as the " Jenny " patent which was ahead of the Barnes patent in time. This was being used on Pullman cars as well as on freight cars, and had been adopted by the Pennsylvania Railroad. The patents thus far owned by Gould were for freight cars. Thereafter he bought the Cowell patents for a platform buf-

fer to be used on passenger cars in conjunction with the automatic coupler, and he then obtained orders from the New York Central Railroad for couplers, vestibules and platforms for passenger cars. At that time there were about twenty different patents for automatic couplers being made by as many competitors in the automatic coupler field.

In 1889 the Gould Coupler Co. of West Virginia was organized, with an authorized capital stock of $5,000,000. In December, 1889, Charles A. Gould sold and conveyed to this company all letters patent which he owned for " automatic car coupling device " for the United States, in exchange for $4,999,500 par value of its capital stock. The remaining $500 of capital stock was issued for cash. The letters patent so transferred were the following:

| Patent No. | Date of issuance. | Subject. | Inventor. |
| --- | --- | --- | --- |
| 10291 | Feb. 27, 1883 | Car coupling | Browning. |
| 254106 | Feb. 28, 1882 | do | Do. |
| 273343 | Mar. 6, 1883 | do | Do. |
| 273664 | do | do | Do. |
| 274560 | Mar. 27, 1883 | do | Cutler. |
| 295483 | Mar. 18, 1884 | Car coupler buffer | Browning. |
| 337650 | Mar. 9, 1886 | Car coupling | Barnes. |
| 304668 | Sept. 2, 1884 | Car buffer | Ricker. |
| 306777 | Oct. 21, 1884 | do | Do. |
| 319796 | June 9, 1885 | Car bumper | Cowell. |

In addition to selling automatic couplers this company continued the business of manufacturing and selling axles, locomotive frames, and link-and-pin couplers, that had been established and carried on by Gould individually. At first the company did not have the facilities for manufacturing the automatic couplers but it had them made for it by others under contract. In the fall of 1893 it completed a plant at Depew, N. Y., where it manufactured malleable iron couplers, passenger car platforms, vestibules, draft gears, passenger car vestibules, and journal boxes. The link-and-pin coupler was covered by patents but the company did not own any of these patents.

The " Jenny " coupler and the " Barnes " coupler each was based on contour lines and was known as a vertical plane coupler. They were made on the principle of two swinging knuckles or jaws pivoting in the head of the coupler, one knuckle engaging in the counter or recess of the opposite coupler. The Barnes coupler differed from the Jenny coupler in the means of locking the knuckle in position. The railroads would not adopt a patented device, so the owners of the Jenny patent waived their rights to the contour-lines principle in so far as its use on freight cars was concerned, but they did not waive it as to passenger cars. The Gould Coupler Co. then

made some changes in the contour-lines principle so as to avoid infringing the Jenny patent on passenger cars, and acquired patents covering these changes.

It was necessary to develop and improve the first automatic couplers in order to overcome difficulties encountered from time to time in use and to meet the requirements of the railroads for safety and increased service. On March 3, 1893, the Federal Safety Appliance Act became a law. It prohibited the use after January 1, 1898, in interstate traffic, of cars not equipped with couplers which coupled automatically by impact and which could be uncoupled without the necessity of men going between the ends of the cars. By the date prescribed in that Act the link-and-pin coupler disappeared from use on the railroads. With the advent of the automatic coupler it became possible to increase the size and capacity of cars and to increase the number of cars in a train, and this result in turn necessitated further development and improvement in the automatic coupler. The period from 1892 to 1900 was one of continuous experimentation and development. During that time there were improvements and developments of the Barnes coupler, especially in the locking device. About 1900 the Gould Coupler Co. adopted a new style of lock, known as the Allen lock. Some years later the Barnes coupler evolved into what was known as the "D" type, or A. R. A. standard coupler, and the "Z" type, which is still being made by the corporation which succeeded the petitioner. In 1892 there were thirty-five other automatic couplers on the market with different types of locking devices. The number of concerns making automatic couplers was gradually reduced until there were five besides the Gould Coupler Co. With the exception of McConway & Torley, who owned the Jenny patent and who made couplers for passenger cars as well as for freight cars, these concerns originally made only automatic couplers for freight cars.

The Gould Coupler Co. of West Virginia, during the period from the date of its organization down to June, 1903, acquired a number of letters patent which were developments, improvements, or changes of the Barnes and Browning patents, and also letters patent covering buffers, passenger car platforms and vestibules, car trucks, draft gears and journal boxes. These letters patent were acquired by purchase or taken out by or on behalf of the Gould Coupler Co. upon inventions made by persons in its employ. Some of them were necessary to protect patents already owned; others covered improvements or developments of such patents.

This company also acquired a series of patents covering improved methods of lighting passenger trains. Originally passenger cars were lighted by oil lamps. This method was replaced by the Pintsch gas system, which was in general use up to the time of the intro-

duction of electricity. The Pintsch gas system was objectionable from the standpoint of comfort and safety. About 1898, Gould acquired the American rights to an English system of lighting cars by electricity, known as the "Stone" system, whereby each car was equipped with a generator driven from the axle and with batteries for the storage of electricity for use while the car is not in motion. The "Stone" system was put into use on the New York Central and the Michigan Central railroads. It did not meet the demands for service of the railroads of the United States, and the Gould Coupler Co. acquired letters patent covering American inventions for lighting systems similar to, but which were improvements over, the "Stone" system.

The following is a list of the patents acquired by the Gould Coupler Co. of West Virginia, in addition to those originally transferred to it by Gould, between the time of its organization and June, 1903. Those dated subsequent to June, 1903, are patents for which application had been filed prior thereto and the rights therein assigned to the Gould Coupler Co. of West Virginia.

| Patent No. | Date of issuance. | Subject. | Inventor. |
|---|---|---|---|
| 466342 | Jan. 5, 1892 | Car coupling | C. A. Gould. |
| 472245 | Apr. 5, 1892 | do | A. J. Allen. |
| 474466 | May 10, 1892 | do | L. Barnes. |
| 478747 | July 12, 1892 | do | C. A. Gould. |
| 480807 | Aug. 16, 1892 | do | R. A. Cowell. |
| 491134 | Feb. 7, 1893 | do | W. F. Richards. |
| 491301 | do | do | M. E. Wallace. |
| 495032 | Apr. 11, 1893 | do | C. A. Gould. |
| 511457 | Dec. 26, 1893 | do | W. F. Richards. |
| 520765 | June 5, 1895 | do | E. D. Bronner. |
| 554310 | Feb. 11, 1896 | do | W. F. Richards. |
| 555619 | Mar. 3, 1896 | do | Do. |
| 562916 | June 30, 1896 | do | Do. |
| 574575 | Jan. 5, 1897 | do | Do. |
| 583631 | June 1, 1897 | do | Do. |
| 584894 | June 22, 1897 | do | Do. |
| 584895 | do | do | Do. |
| 585163 | do | do | Do. |
| 586273 | July 13, 1897 | do | Do. |
| 586274 | do | do | Do. |
| 663640 | Dec. 11, 1900 | do | Do. |
| 613314 | Nov. 1, 1898 | do | Do. |
| 638357 | Dec. 5, 1898 | do | Do. |
| 640225 | Jan. 2, 1900 | do | Do. |
| 658073 | Sept. 18, 1900 | do | Do. |
| 836404 | Nov. 20, 1906 | do | Do. |
| 457929 | Aug. 18, 1891 | Passenger platform buffer | T. A. Bissell. |
| 482538 | Sept. 13, 1892 | do | Do. |
| 489135 | Jan. 3, 1893 | do | M. W. Wallace. |
| 495060 | Apr. 11, 1893 | do | W. F. Richards. |
| 495061 | do | do | Do. |
| 520573 | May 29, 1894 | do | Do. |
| 520574 | do | do | Do. |
| 520575 | do | do | Do |
| 541529 | June 25, 1895 | do | Do. |
| 556031 | Mar. 10, 1896 | do | L. B. Smyzer. |
| 557884 | Apr. 7, 1896 | do | W. F. Richards. |
| 566018 | Aug. 18, 1896 | do | Do. |
| 568072 | Sept. 22, 1896 | do | Do. |
| 711646 | Oct. 21, 1902 | do | Do. |
| 729787 | June 2, 1903 | do | T. L. McKeen. |
| 741277 | Oct. 13, 1903 | do | W. F. Richards. |
| 745067 | Dec. 1, 1903 | do | Do. |
| 26515 | Jan. 12, 1897 | Locomotive buffers | Do. |
| 524072 | Aug. 7, 1894 | do | Do. |

| Patent No. | Date of issuance. | Subject. | Inventor. |
|---|---|---|---|
| 480628 | Aug. 9, 1892 | Locomotive couplers | J. E. Sague. |
| 498029 | May 23, 1893 | do | W. F. Richards. |
| 509100 | Nov. 21, 1893 | do | Do. |
| 613313 | Nov. 1, 1898 | do | Do. |
| 676154 | June 11, 1901 | do | Do. |
| 700982 | May 27, 1902 | do | Do. |
| 701018 | June 3, 1902 | do | Do. |
| 26585 | Feb. 2, 1897 | Car trucks | Do. |
| 26622 | Feb. 9, 1897 | do | Do. |
| 26903 | Apr. 13, 1897 | do | Do. |
| 580534 | do | do | Do. |
| 580535 | do | do | Do. |
| 594559 | do | do | Do. |
| 389358 | Sept. 11, 1888 | Passenger car vestibules | T. A. Bissell. |
| 389359 | do | do | Do. |
| 389437 | do | do | Do. |
| 414228 | Nov 5, 1889 | do | A. G. Leonard. |
| 435676 | Sept. 2, 1890 | do | T. A. Bissell. |
| 449896 | Apr. 7, 1891 | do | Do. |
| 453782 | June 9, 1891 | do | Do. |
| 470799 | Mar. 15, 1892 | do | Do. |
| 526540 | Sept. 25, 1894 | do | W. F. Richards. |
| 458532 | Aug. 25, 1891 | Freight-car buffers | J. Green. |
| 529857 | Nov. 27, 1894 | do | C. A. Gould. |
| 533609 | Feb. 5, 1895 | do | W. F. Richards. |
| 558209 | Apr. 14, 1896 | do | Do. |
| 574576 | Jan. 5, 1897 | do | Do. |
| 448406 | Mar. 17, 1891 | Passenger-car couplers | T. A. Bissell. |
| 495062 | Apr. 11, 1893 | do | W. F. Richards. |
| 537936 | Apr. 23, 1895 | do | Do. |
| 560564 | May 26, 1896 | do | Do. |
| 638758 | Dec. 5, 1899 | do | Do. |
| 524217 | Aug. 7, 1894 | Passenger-car buffers without platforms. | Do. |
| 533319 | Jan. 29, 1895 | do | Do. |
| 533418 | do | do | Do. |
| 488326 | Dec. 20, 1892 | Passenger draft gear | T. A. Bissell. |
| 559496 | May 5, 1896 | Locomotive vestibule and buffer. | W. F. Richards. |
| 592885 | Nov. 2, 1897 | Coupler-unlocking device | Do. |
| 620803 | Mar. 7, 1899 | Steel platform frames | Do. |
| 645649 | Mar. 20, 1900 | do | Do. |
| 625566 | 1900 | Car journal boxes | J. D. Murry. |
| 665268 | Jan. 1, 1901 | do | W. F. Richards. |
| 670034 | Mar. 19, 1901 | do | Do. |
| 670642 | Mar. 26, 1901 | do | Do. |
| 786993 | Apr. 11, 1905 | do | Do. |
| 786994 | do | do | Do. |
| 808684 | Jan. 2, 1906 | do | Do. |
| 666969 | Jan. 29, 1901 | Draft gear | T. L. McKeen. |
| 666970 | 1901 | do | Do. |
| 696184 | Mar. 25, 1902 | do | Do. |
| 698715 | 1902 | do | Do. |
| 714015 | 1902 | do | Do. |
| 714815 | 1902 | do | Do. |
| 725105 | Apr. 14, 1903 | do | C. E. Lucas. |
| 604081 | May 17, 1898 | do | W. F. Richards. |
| 612139 | Oct. 11, 1896 | Casing for lighting apparatus | Do. |
| 645216 | Mar. 13, 1900 | Electric lighting apparatus | Do. |
| 647155 | Apr. 10, 1900 | do | Do. |
| 648144 | Apr. 17, 1900 | do | R. N. Chamberlain. |
| 659829 | Oct. 16, 1900 | Dynamo-electric machine | W. F. Richards. |
| 668889 | Feb. 19, 1901 | Electric switch | Do. |
| 669706 | Mar. 12, 1901 | do | Do. |
| 705487 | July 22, 1902 | Dynamo regulator | W. A. Turbayne. |
| 732239 | June 30, 1903 | Generator regulator | Turbayne & Hubbard |

The evidence does not show the amounts paid by Gould for the patents bought by him and transferred to the Gould Coupler Co. of West Virginia when it was organized, or the amounts paid by this company for patents it acquired subsequently by purchase.

In June, 1903, the petitioner, the Gould Coupler Co. of New York, was incorporated in that State with an authorized capital stock of $5,000,000. It acquired, for a consideration of $4,995,000 par value

of its capital stock and $5,000 in cash, all of the property of the Gould Coupler Co. of West Virginia, "together with the book accounts, bills receivable, claims, demands of every kind and nature, patents, trade-marks, licenses, and all other rights and privileges, * * * subject nevertheless to the payment of all liabilities and the assumption of all obligations, contracts, etc., of the company." The stockholders of the West Virginia corporation surrendered their shares and received a like number of shares in the New York corporation. At that time Charles A. Gould owned 49,600 shares.

The first five years of operation of the Gould Coupler Co. of West Virginia (being for fiscal years ending June 30) show the following results:

| Year | Cash paid in. | Net profits, per books. | Surplus, per books. |
|---|---|---|---|
| 1891 | $500.00 | $281,084.84 | |
| 1892 | 500.00 | 147,654.80 | $281,084.84 |
| 1893 | 500.00 | 355,013.88 | 428,739.64 |
| 1894 | 500.00 | 102,936.92 | 533,753.52 |
| 1895 | 500.00 | 343,368.05 | 636,690.44 |

The net profits of the company during the five years preceding the organization of the New York corporation of the same name (being for fiscal years ending June 30) were as follows:

| Year. | Net profits. |
|---|---|
| 1899 | $446,157.09 |
| 1900 | 475,589.61 |
| 1901 | 198,118.40 |
| 1902 | 312,616.37 |
| 1903 | 259,891.36 |
| Five-year average | 338,474.57 |

The value of the tangible property employed in the business in the same period was as follows:

| Year. | Value of tangibles. |
|---|---|
| 1899 | $1,382,682.42 |
| 1900 | 1,428,839.51 |
| 1901 | 1,504,429.12 |
| 1902 | 1,377,547.52 |
| 1903 | 1,440,163.89 |
| Five-year average | 1,426,732.49 |

Allowing a return of 9 per cent on the average value of the tangible property for the preceding five years, and capitalizing the remaining average net earnings on the basis of six years' purchase, we find that the value of the intangible property paid in to the Gould Coupler Co. for its stock on June 23, 1903, was $1,260,411.90.

In 1918 the petitioner was affiliated with the Gould Storage Battery Co. of New York, the Gould Storage Battery Co. of California,

the Gould Storage Battery Co. of Illinois, the Gould Storage Battery Co. of Massachusetts, and the Gould Storage Battery Co. of Ohio.

The Gould Storage Battery Co. of New York was incorporated as the successor of a corporation named the Gould Storage Battery Co. of West Virginia. The latter was incorporated in April, 1899, with an authorized capital stock of $5,000,000. For $4,999,500 of its capital stock, it acquired from Charles A. Gould "letters patent of the United States No. 572,363, bearing date December 1, 1896, for improvements in battery grids," and also all of his right, title and interest in and to "applications for letters patent of the United States made by Rufus N. Chamberlain, bearing date March 1, 1899, for improvements in processes for preparing plates for storage batteries and improvements in machines for spinning grids." The company engaged in the manufacture of batteries of different kinds for various uses and the manufacture of electric lighting equipment for trains. It supplied batteries for train lighting to the Gould Coupler Co. Among the other uses for which batteries were made were the propulsion of automobiles and street cars, ignition of gasoline engines, telegraph and telephones, central lighting stations and isolated plants, electric launches and submarines, and portable batteries.

There was competition in the train lighting field, and other companies, protected by patents, entered it. There were five or six other companies actively engaged in the business.

During the period from 1899 to 1903, the Gould Storage Battery Co. of West Virginia developed or acquired numerous additional patents. These covered improvements in the patents originally acquired, various improvements in train lighting systems, generators, generator suspension and drive, control devices, storage batteries, separators for batteries, and processes for plates. In June, 1903, it owned the following patents:

| Patent No. | Date of issuance. | Subject. | Inventor. |
|---|---|---|---|
| 572363 | Dec. 1, 1896 | Battery grid and machine | A. F. Madden. |
| 720350 | Feb. 10, 1903 | System of distribution | A. S. Hubbard. |
| 720351 | 1903 | Train lighting system | Do. |
| 732238 | June 30, 1903 | Generator regulator | W. A. Turbayne. |
| 706201 | Aug. 5, 1902 | Lubricator | W. F. Richards |
| 604082 | May 17, 1898 | Generator suspension and drive. | Do. |
| 604083 | do | do | Do. |
| 604084 | do | do | Do. |
| 604085 | do | do | Do. |
| 604101 | do | do | Wilhelm J. Richar. |
| 615904 | 1898 | do | W. F. Richards. |
| 615905 | Dec. 13, 1898 | do | Do. |
| 628658 | 1898 | do | C. A. Gould. |
| 634542 | Oct. 10, 1899 | do | W. F. Richards. |
| 647034 | Apr. 17, 1900 | do | Do. |
| 653885 | July 17, 1900 | do | Do. |
| 659697 | Oct. 16, 1900 | do | Richards & Chapman. |
| 705854 | July 29, 1902 | do | A. F. Madden. |

| Patent No. | Date of issuance. | Subject. | Invention. |
|---|---|---|---|
| 649105 | May 8, 1900 | Regulator control device | O. P. Loomis. |
| 654325 | July 24, 1900 | do | W. F. Richards. |
| 651664 | June 12, 1900 | Electric distribution system. | A. S. Hubbard. |
| 784732 | Mar. 14, 1905 | do | R. N. Chamberlain. |
| 686886 | Nov. 19, 1901 | Separator for batteries | Do. |
| 699492 | May 6, 1902 | Process for plates | Do. |
| 699493 | do | Method of cleaning plates | Do. |
| 699494 | May 14, 1902 | Grid machine | W. F. Richards. |
| 812295 | Feb. 13, 1906 | do | Do. |
| 712178 | Oct. 28, 1902 | Separator for plates | R. N. Chamberlain. |
| 712995 | Nov. 4, 1902 | Process for plates | Do. |
| 720326 | Feb. 10, 1903 | do | Do. |
| 725218 | Apr. 14, 1903 | Storage battery | Do. |
| 733813 | July 14, 1903 | do | Do. |

The Gould Storage Battery Co. of New York was formed in June, 1903, with an authorized capital stock of $5,000,000, to purchase, take over and continue the business then carried on by the Gould Storage Battery Co. of West Virginia. For $4,995,000 par value of its capital stock and $5,000 in cash, it acquired from the Gould Storage Battery Co. of West Virginia " all of its property, real and personal, wherever the same may be situated, together with all book accounts, bills receivable, claims, demands of every kind and nature, patents, trademarks, licenses, and all rights and privileges * * * and subject nevertheless to the payment of all liabilities and the assumption of all obligations, contracts, etc., of the company." The stockholders of the old company then received stock in the new company in exchange for their holdings. Charles A. Gould was the principal stockholder.

The evidence does not disclose the amounts paid by Gould for the patents transferred by him to the Gould Storage Battery Co. of West Virginia, or the cost to this company of patents thereafter acquired by it. Neither this company nor its New York successor ever showed any net profits. We are unable to find from the evidence that the intangible property transferred from the Gould Storage Battery Co. of West Virginia to the New York corporation of the same name had any value at the time of the transfer.

From the time of their original organization down to 1918, the Gould Coupler Co. and the Gould Storage Battery Co. engaged in a continuous process of patent development and patent acquisition.

It was stipulated by counsel that the dissolution of the Gould Coupler Co. and the Gould Storage Battery Co. of West Virginia, and the incorporation of the New York corporations of the same names, effected in each case a change of domicile.

The two West Virginia corporations, during the time they were operating, and their respective New York successors, made expenditures in the amounts set forth below for patent development, appli-

cations for patents, and in litigation involving patents, which were charged to expenses and not capitalized:

| Year. | Gould Coupler Co. | Gould Storage Battery Co. | Year. | Gould Coupler Co. | Gould Storage Battery Co. |
|---|---|---|---|---|---|
| 1891 | $625.90 | | 1906 | $1,722.58 | $29,982.69 |
| 1892 | 363.60 | | 1907 | 1,120.00 | 9,725.22 |
| 1893 | 1,953.48 | | 1908 | 3,005.72 | 11,496.29 |
| 1894 | 10,305.27 | | 1909 | 6,460.94 | 12,267.92 |
| 1895 | 9,698.27 | | 1910 | 18,343.16 | 26,799.47 |
| 1896 | 16,308.01 | | 1911 | 8,911.59 | 12,359.20 |
| 1897 | 19,248.38 | | 1912 | 6,948.10 | 15,130.60 |
| 1898 | 4,108.15 | | 1913 | 5,856.93 | 8,897.18 |
| 1899 | 1,369.00 | $300.00 | 1914 | 34,530.50 | 14,025.97 |
| 1900 | 1,244.00 | 1,122.07 | 1915 | 41,942.65 | 3,797.90 |
| 1901 | 331.00 | 4,304.88 | 1916 | 42,779.57 | 1,953.55 |
| 1902 | 882.50 | 1,587.82 | 1917 | 68,521.21 | 1,158.63 |
| 1903 | 1,383.00 | 5,002.31 | | | |
| 1904 | 3,111.04 | 13,409.55 | | 313,865.14 | 186,582.93 |
| 1905 | 2,700.59 | 22,261.68 | | | |

In 1918 and 1919, substantially all of the capital stock of the Gould Coupler Co. of New York and the Gould Storage Battery Co. of New York was owned or controlled by the same interests. In addition, the Gould Storage Battery Co. of New York owned all of the capital stock of the Gould Storage Battery Co. of California, the Gould Storage Battery Co. of Illinois, the Gould Storage Battery Co. of Massachusetts, and the Gould Storage Battery Co. of Ohio. The two last named discontinued business in 1918. Consolidated returns were filed for both years and their affiliation was acquiesced in by the Commissioner.

Certain of the affiliated companies show operating deficits as follows (no dividends having been paid):

| | Jan. 1, 1917. | Jan. 1, 1918. | Jan. 1, 1919. |
|---|---|---|---|
| Gould Storage Battery Co. of New York | $750,466.50 | $955,582.93 | $1,503,893.69 |
| Gould Storage Battery Co. of California | 6,904.34 | 13,851.06 | |
| Gould Storage Battery Co. of Illinois | 28,686.16 | 24,359.15 | 14,934.14 |
| Gould Storage Battery Co. of Massachusetts | 16,739.01 | 23,534.46 | |
| Gould Storage Battery Co. of Ohio | 21,793.88 | 45,855.22 | |

The Gould Storage Battery Co. of Massachusetts discontinued business in 1918. On August 1, 1918, it owed the Gould Storage Battery Co. of New York $21,182.46, and the latter had invested in the capital stock of the former $2,600, being the par value of all of its outstanding stock. On that date the New York company charged off both of these amounts to profit and loss.

The Gould Storage Battery Co. of Ohio also discontinued business in 1918. The Gould Storage Battery Co. of New York owned all of its

outstanding capital stock, amounting to $8,000, which was purchased by it at par. On December 31, 1918, the account of the Ohio company with the New York company shows a debit of $46,331.93. Both of these amounts were charged off by the New York company to profit and loss on the date named.

On January 1, 1918, the book value of the tangible assets of the Gould Coupler Co. was $1,925,473.87. Among them were two items of non-depreciable assets, viz, land $40,993.12; small tools $147,919.75. Subtracting these two items, the depreciable items aggregate $1,736,561, which agrees with the company's books and with the balance sheet prepared by an examining revenue agent. The Commissioner calculated depreciation on a total of $1,590,531.95, the following items not being included:

| | |
|---|---:|
| Factory office equipment | $11,130.11 |
| Forge addition | 447.00 |
| Rooming house | 21,976.50 |
| New building | 107,080.59 |
| New York office equipment | 9,447.96 |
| General vehicle trucks | 443.40 |
| 3½ ton Waverly truck | 510.22 |
| Automobile purchased in 1917 | 445.00 |
| Miscellaneous equipment | 1,527.48 |

There are two credit balances, as follows: Forge, blacksmith and carpenter shop, $6,139.28; service truck, $800.

On January 1, 1918, the book value of the tangible assets was $1,917,201.79, with non-depreciable items of: land $40,993.21; small tools, $148,221.23; making the total depreciable assets $1,727,987.44. The total used by the Commissioner was $1,592,451.10, no depreciation being allowed on the following items.

| | |
|---|---:|
| Factory office equipment | $11,130.11 |
| Forge addition | 447.00 |
| Forge, blacksmith and carpenter shop | 4,000.00 |
| New buildings | 107,080.59 |
| New York office equipment | 9,718.49 |
| Power plant | 2,405.98 |
| General vehicle truck | 403.47 |
| Waverly truck | 510.22 |
| Automobile purchased in 1917 | 445.00 |
| Miscellaneous equipment | 1,527.48 |

There are credit items of malleable plant, $1,332; and service truck, $800.

The following table shows the amounts and rates used by the Commissioner in computing depreciation:

|  | Amount. | Rate (per cent.) | Depreciation. |
|---|---|---|---|
| **1918.** |  |  |  |
| Plant and machinery | $1,361,098.31 | 4 | $54,443.93 |
| Power plant | 202,238.96 | 5¼ | 10,617.55 |
| Equipment | 14,616.27 | 15 | 2,192.40 |
| Yard engine | 8,375.00 | 10 | 837.48 |
| Equipment | 3,203.41 | 20 | 640.68 |
|  | 1,589,531.95 | ---------- | 68,734.04 |
| **1919.** |  |  |  |
| Plant and machinery | 1,364,017.46 | 4 | 54,560.70 |
| Power plant | 202,238.96 | 5¼ | 10,617.55 |
| Equipment | 14,616.27 | 15 | 2,192.40 |
| Yard engine | 8,375.00 | 10 | 837.48 |
| Equipment | 3,203.41 | 20 | 640.68 |
|  | 1,592,451.10 | ---------- | 68,848.81 |

## OPINION.

GREEN: 1. When the Gould Coupler Co. of West Virginia was organized in 1889, certain patents were transferred to it in exchange for $4,999,500 par value of its stock. The Gould Storage Battery Co. of West Virginia, incorporated in 1899, likewise acquired patents for $4,999,500 of its stock. In 1903 two corporations were formed in New York State, bearing the same names and having the same amounts of authorized capital stock as these West Virginia companies, and they took over the business and assets of the latter, respectively, in exchange for substantially all of the capital stock of the new corporations. At the time of the transfer in 1903, each of the West Virginia corporations, it appears, owned many more patents than they acquired originally (although the first patents acquired by the Gould Coupler Co. had expired prior to 1903). The Commissioner took the position that, in determining invested capital, the New York corporations would be entitled to have included only the value, if any, of intangibles paid in for stock of their predecessors—the West Virginia corporations—in 1889 and 1899, respectively. We held in *Appeal of Regal Shoe Co.*, 1 B. T. A. 896, and *Appeal of National Bakers' Egg Co.*, 3 B. T. A. 1205, that invested capital is to be measured by the value of property paid in for stock of the taxpayer, and not by property paid in to a predecessor corporation (except, of course, in cases which come within section 331, Revenue Act of 1918). Those decisions are applicable to the facts in this case.

2. This being so, we must determine the value of the intangible property paid in to each of the New York corporations in 1903. The value of the tangible property paid in is not in dispute.

We will first consider the Gould Coupler Co. By June, 1903, all of the ten patents transferred by Gould to the West Virginia corporation had expired, so we can give no weight to the petitioner's argument that the Browning and Barnes patents were peculiarly valuable as basic patents. The Gould Coupler Co. of West Virginia had, however, practically from the time of its organization down to June, 1903, engaged continuously in developing and improving the first automatic couplers, and patents were obtained covering these improvements and developments. It also acquired patents covering a number of other railroad appliances, and its engineers from time to time devised improvements in those appliances to meet the demands of railroad service. The improvements also were covered by patents. At the date of the transfer to the New York corporation, it owned 109 patents classified as follows:

| | |
|---|---|
| Car couplings | 26 |
| Passenger platform buffers | 17 |
| Locomotive buffers | 2 |
| Car trucks | 13 |
| Passenger car vestibules | 9 |
| Freight car buffers | 5 |
| Passenger car couplers | 5 |
| Passengers car buffers without platforms | 3 |
| Passenger car draft gear | 1 |
| Locomotive vestibule and buffer | 1 |
| Coupler unlocking device | 1 |
| Steel platform frames | 2 |
| Journal boxes | 7 |
| Draft gear | 7 |
| Electric car lighting equipment | 10 |

There is no doubt in our minds that these patents were valuable in the enterprise as income-producing factors. It is also apparent that there was in the business a considerable good will value which contributed materially to its success. The products of the company were being used on some of the principal railroads, such as the New York Central, the Erie, the Michigan Central, and the Lackawanna. As Gould testified, the management of the Lackawanna Railroad had directed that all axles for that railroad be bought from him. By 1903 the business was well enough established so that it was not affected by the expiration of the ten original patents. These had expired on various dates between February 28, 1899, and March 9, 1903. By that time the West Virginia corporation had developed or acquired the series of patents mentioned above, and it was so organized in personnel as to enable it to continue experimentation and the further development and acquisition of patents.

The 109 patents then owned had different periods of unexpired life, as follows:

| Number of patents. | Unexpired life (years). | Number of patents. | Unexpired life (years). |
|---|---|---|---|
| 3 | 2 | 11 | 10 |
| 1 | 3 | 16 | 11 |
| 1 | 4 | 4 | 12 |
| 5 | 5 | 3 | 13 |
| 9 | 6 | 9 | 14 |
| 10 | 7 | 7 | 15 |
| 7 | 8 | 8 | 16 |
| 6 | 9 | 9 | 17 |

From the date of its organization down to 1903 the company continuously showed large net earnings. During the five years preceding June 30, 1903, with an average tangible capital of $1,426,-782.49, it showed average net profits of $338,474.57. The only paid-in tangible property was $500 in cash. Upon this showing we are satisfied that there was paid in to the Gould Coupler Co. of New York intangible property of considerable value. We believe it proper, upon the evidence, to determine its value by the formula method. The petitioner contends for a valuation, by this method, arrived at by allowing a return of 8 per cent on the average tangible assets, and capitalizing the balance of the average net profits at 10 per cent, which gives a value for intangibles of $2,243,359.70. This attributes about two-thirds of the net earnings to intangibles. We believe, however, after careful consideration of all of the evidence, a fairer basis would be to allow 9 per cent return on the tangible property and to capitalize the remaining average net earnings on the basis of six years' purchase, or 16⅔ per cent, which results in a valuation of $1,260,411.90.

The Gould Storage Battery Co. of New York acquired all of the assets of the Gould Storage Battery Co. of West Virginia. Among them were 32 patents relating to batteries, plates, processes, and train lighting equipment. Two of these had been acquired by the West Virginia corporation from Gould upon its formation; the remainder were acquired or developed subsequently. The evidence does not disclose the amount paid by Gould for the two original patents, or the cost to the company of the patents obtained later. The company had no net earnings. There is nothing in evidence from which we can determine that the intangibles transferred to the Gould Storage Battery Co. of New York had value at June, 1903.

3. The total outstanding stock of the Gould Coupler Co. of New York was $5,000,000. Therefore, the value of the intangibles paid in to this company for stock exceeds 25 per cent of the par value of

its total stock outstanding on March 3, 1917—25 per cent being the limitation placed by section 326(a)(4), Revenue Act of 1918, upon the amount of intangibles that may be included in invested capital. The petitioner claims this limitation should, in affiliations, be applied to the total outstanding stock of the affiliated group and not to each member of the group separately. Section 240(b) defines two classes of affiliations:

(1) If one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

Regulations 45, article 865, provides that, in the case of the former class of affiliations, the limitation on the amount of intangibles shall be in the aggregate 25 per cent of the total outstanding stock, but as to the latter class, it provides that the limitation shall be applied to each corporation separately. In the present case we have a combination of the two classes. Gould owned substantially all the stock of the Gould Coupler Co. and of the Gould Storage Battery Co. of New York, but the stock of the other four battery companies was all owned by the Gould Storage Battery Co. of New York. The question thus indicated is, What is the correct method for either or both of the two classes of affiliation or for an affiliation which is a combination of the two?

This leads to a consideration of what Congress intended when it said in section 240(a) " corporations which are affiliated * * * shall * * * make a consolidated return of net income and invested capital for the purposes of this title [income tax] and Title III [profits taxes], and the taxes thereunder shall be computed and determined on the basis of such return ", and, later, " the total tax shall be computed in the first instance as a unit." There are two other questions in this case, to be referred to presently, the answers to which also depend upon the construction of this language. Much controversy has arisen over what was meant by the term " consolidated return," and there are current two conflicting points of view. One, commonly referred to as the " legal theory," maintains that " consolidation " is a matter of procedure, and the consolidated invested capital and net income should be the sum of the amounts of invested capital and net income, separately computed for each of the several affiliated corporations. Under the other, known as the " accountant's " or " economic unit " theory, all intercompany transactions and relationships are eliminated, and a resulting balance sheet and profit and loss statement is obtained which shows the situation as though it were a single business. The advocate of either theory generally insists that his theory should be adhered to consistently in applying section 240.

In the Revenue Act of 1917 there was no express provision for affiliation. However, the Commissioner, with the approval of the Secretary of the Treasury, promulgated Regulations 41, relating to the profits tax, which provided (articles 77 and 78) that certain corporations should be deemed affiliated and that the Commissioner might require consolidated returns from such corporations whenever necessary more equitably to determine the invested capital and net income. These articles are quoted in full below:

Art. 77. *When affiliated corporations must furnish information as to intercorporate relations.*—For the purpose of the excess profits tax every corporation will describe in its return all its intercorporate relationships with other corporations with which it is affiliated, and will furnish such information in relation thereto as will enable the Commissioner of Internal Revenue to compute the amount of the tax properly due from each corporation on the basis of an equitable and lawful accounting.

For the purpose of this regulation two or more corporations will be deemed to be affiliated (1) when one such corporation owns directly or controls through closely affiliated interests or by a nominee or nominees, all or substantially all of the stock of the other or others, or when substantially all of the stock of two or more corporations is owned by the same individual or partnership, and both or all of such corporations are engaged in the same or a closely related business; or (2) when one such corporation (a) buys from or sells to another products or services at prices above or below the current market, thus effecting an artificial distribution of profits, or (b) in any way so arranges its financial relationships with another corporation as to assign to it a disproportionate share of net income or invested capital.

Art. 78. *When affiliated corporations may be required to make consolidated return.*—Whenever necessary to more equitably determine the invested capital or taxable income, the Commissioner of Internal Revenue may require corporations classed as affiliated under article 77 to furnish a consolidated return of net income and invested capital. Where such consolidated return is required it may be made by any one or more of such corporations or by all of them acting jointly; but if such affiliated corporations, when requested to file such consolidated return, neglect or refuse to do so, the Commissioner of Internal Revenue may cause an examination of the books of all such corporations to be made and a consolidated statement to be made from such examination. In cases where consolidated returns are accepted, the total tax will be computed in the first instance as a unit upon the basis of the consolidated return and will be assessed upon the respective affiliated corporations in such proportions as may be agreed among them. If no such agreement is made the tax will be assessed upon each such corporation in accordance with the net income and invested capital properly assignable to it.

The substance of these articles was later enacted into section 1331 of the Revenue Act of 1921. Provisions with respect to affiliations and consolidations were incorporated into the Revenue Act of 1918 in section 240 thereof. That section changed the definition of affiliation and made the filing of consolidated returns mandatory, but the underlying principle expressed in articles 77 and 78 was adopted. This is shown by the report of the Finance Committee on the Revenue

Bill when it was before the Senate, which contains the following explanatory statement (Sen. Rep. No. 617, 65th Cong., 3d sess., pp. 8, 9):

Provision has been made in section 240 for a consolidated return, in the case of affiliated corporations, for purposes both of income and profits taxes. A year's trial of the consolidated return under the existing law demonstrated the advisability of conferring upon the commissioner explicit authority to require such returns.

So far as its immediate effect is concerned consolidation increases the tax in some cases and reduces it in other cases, but its general and permanent effect is to prevent evasion which can not be successfully blocked in any other way. Among affiliated corporations it frequently happens that the accepted intercompany accounting assigns too much income or invested capital to company A and not enough to company B. This may make the total tax for the corporation too much or too little. If the former, the company hastens to change its accounting method; if the latter, there is every inducement to retain the old accounting procedure, which benefits the affiliated interests, even though such procedure was not originally adopted for the purpose of evading taxation. As a general rule, therefore, improper arrangements which increase the tax will be discontinued, while those which reduce the tax will be retained.

Moreover, a law which contains no requirement for consolidation puts an almost irresistible premium on a segregation or a separate incorporation of activities which would normally be carried as branches of one concern. Increasing evidence has come to light demonstrating that the possibilities of evading taxation in these and allied ways are becoming familiar to the taxpayers of the country. While the committee is convinced that the consolidated return tends to conserve, not to reduce, the revenue, the committee recommends its adoption not primarily because it operates to prevent evasion of taxes or because of its effect upon the revenue, but because the principle of taxing as a business unit what in reality is a business unit is sound and equitable and convenient both to the taxpayer and to the Government.

It will be observed that the Finance Committee recommended the adoption of section 240 because, as it states, the principle of taxing as a business unit what really is a business unit is sound and equitable and convenient. As pointed out above, one of the respects in which this section differs from articles 77 and 78 is that it prescribes as the basis of affiliation control of the stock, without regard to the kind of business the different corporations may be engaged in or what their other relations to each other may be. The test is unity of control of substantially all the stock, it being apparent that such control would enable the "unit" to make intercompany arrangements affecting the invested capital or net income of the separate members. It was recognized by Congress that the equitable and convenient way of dealing with such a situation was to treat a group of corporations thus controlled as a business unit, and hence it provided for a consolidated return. It is plain that the purpose was to circumvent intercompany dealing and accounting practices, of whatever origin or object, through which the invested capital or net income of a

corporation in a group under common control might be artificially increased or diminished, with the attendant effect on the taxes upon such company if separately assessed. The so-called "legal" theory does not fulfill this purpose, nor does the language of the statute support this theory. Section 240 provides that the taxes shall be computed as a unit—not as an aggregate—and upon the basis of a consolidated return. The verb "to consolidate" means more than to add together; it means to weld into one things that previously were separate. It is derived from the Latin verb *consolidare*, "to make firm or solid." The following definitions are given in Murray's New English Dictionary: "To make solid, to form into a solid or compact mass; to solidify; to combine compactly into one mass, body or connected whole (territories, estates, companies, administrations, commercial concerns and the like)." The participial adjective "consolidated" is defined to mean "made solid, firm or compact; solidified; combined, unified." The language of section 240 and its legislative background show that Congress used the word "consolidated" in the sense of "unified"; there is nothing to indicate they used it in the sense of "summarized." Further, it appears from the report of the Finance Committee that section 240 was recommended after a year's trial of the consolidated return under the 1917 law. This is the time during which Regulations 41, articles 77 and 78, quoted above, were in force. These articles, it will be noted, provide that the Commissioner may cause an examination of the books of all of the affiliated corporations to be made and a "consolidated statement" to be made therefrom. The word "consolidated" had become current in accounting nomenclature to describe balance sheets, profit and loss statements, and income statements of a group of companies connected with each other by control of stockholdings. Such statements are used in business to show the financial condition or earning power of an undertaking thus constituted after eliminating all the relations of the constituent companies one to another. The consolidated balance sheet represents the ultimate financial position of the group to the outside world after the elimination of the intercompany relationships.

In the light of the genesis of section 240, the object sought to be attained, and the sense in which the word "consolidated" is used in accounting practice, we are led to the conclusion that Congress intended to require consolidated returns of net income and invested capital arrived at by constructing a single composite invested capital for the group from which duplications and intercompany obligations would have been eliminated, and one statement of net income based on a profit and loss statement from which would have been eliminated all intercompany losses, profits, and other transactions

affecting income. We are not to be understood as approving any particular accounting practice, but are pointing out the method to be followed in applying the provisions of the statute. If any inconsistency appears between the so-called " accountant's " theory and any provision of the statute, the latter, of course, will control.

It follows from what we have said that, in applying the limitation on the amount of intangibles, the group shall be treated as a unit, i. e., the limitation shall be measured by the par value of the total outstanding stock of the group. This rule should be followed in both classes of affiliation, and hence in a combination of the two. There is no authority in the statute for treating the two classes differently.

4. We come now to the question, Should the earned surplus of the Gould Coupler Co. be reduced by the operating deficits of the other affiliated corporations in arriving at the consolidated invested capital?

In considering this question, the place of invested capital in the scheme of the profits taxes should not be overlooked. These taxes are measured and graded, not by net income, but by the relation of net income to the invested capital which contributed to its production. They are imposed upon net income in excess of credits, and the credits are measured by the amount of the invested capital.

In defining " invested capital " Congress limited it to the " actual cash value " of property paid in (with certain limitations and qualifications not here material) and earned surplus. The measure is actual contributions made for stock or shares and actual accretions in the way of surplus. The purpose of Congress was to confine the capital, the income from which was to be in part exempted from these special taxes, to the risks accepted by the investors in embarking in the enterprise, including earned surplus or undivided profits left in the business. *LaBelle Iron Works v. United States*, 256 U. S. 377. The common sense motive was to have a check on inflation. In the case of an affiliation, treating the group as a unit—as we hold it should be treated—it is apparent that the amount at risk, in addition to the paid-in capital, is the *net* earned surplus.

There is a further consideration impelling us to answer this question in the affirmative. The paid-in invested capital of a corporation, as represented by its capital stock, remains fixed, that is to say, it is not reduced by an operating deficit. *Appeal of Guarantee Construction Co.*, 2 B. T. A. 1145. Hence, in an affiliation, if the operating deficits were not offset against earned surplus, the consolidated invested capital could be inflated by building up an artificial earned surplus in one member at the expense of others whose invested capital would not be correspondingly reduced. It was just this kind of result which Congress intended to circumvent when it enacted section 240.

5. Further questions relating to the consolidated return arise out of the claim of the petitioner for deduction of alleged losses sustained by the Gould Storage Battery Co. of New York upon the cessation of business by the storage battery companies of Ohio and Massachusetts. These companies discontinued business in 1918— the Ohio corporation on December 30, and the Massachusetts corporation on August 1.

The Ohio corporation was indebted to the Gould Storage Battery Co. of New York in the sum of $45,855.22 on January 1, 1918; on December 31, 1918, the indebtedness was $46,331.93. The latter owned all of its outstanding stock of $8,000 par value.

The Massachusetts corporation owed the New York corporation on January 1, 1918, $23,534.46; on August 1, 1918, $21,182.46. The latter owned all of the capital of the Massachusetts corporation, amounting to $2,600, par value.

The Commissioner disallowed the deduction of both the debts and the investment in stock on the ground that they were intercompany losses. The petitioner's claim for their allowance is based on its argument that the invested capital and net income of an affiliation should be separately determined in the first instance and then added together to arrive at the consolidated invested capital and net income; that the deductions would be allowed to the New York corporation, under section 234(a)(4), if it had made a separate return. Neither party drew any distinction between the debts and the investment in stock, or between debts incurred while the companies were affiliated and those arising before affiliation.

Operating losses sustained by any member during the period of affiliation are deducted in arriving at the consolidated net income. It is, of course, immaterial in determining consolidated net income that such losses are met from advances made by one of the other members. That is an internal arrangement which does not affect the group as a taxable entity. The loss of any member is a loss of the group, and the loss may not be deducted again in the form of an intercompany obligation which may have become worthless. Through the group having received the benefit of the deduction, each constituent corporation has benefited by virtue of its being a member of the group. This disposes of any question of the deductibility of indebtedness resulting from operating losses of the subsidiaries during the period of affiliation.

The petitioner asserts, in its brief, that the Ohio and Massachusetts corporations were dissolved. In a careful examination, we are unable to find that this is shown by the evidence, and we can not assume it to be a fact. A witness testified, with respect to the Massachusetts corporation, " So far as I know the company went out of

business at that time"; and as to the Ohio corporation, " I understand that the company discontinued business in Ohio." It is well settled that dissolution is not effected by a cessation of corporate business and acts; mere non-user does not dissolve a corporation. 3 Cook on Corporations, 8th ed., section 631, p. 2307, and cases cited. The record shows merely that the two subsidiaries discontinued business and that the parent company charged off their indebtedness to it and also its investment in their stock. There is no evidence of what assets the subsidiaries had, or that they did not have any, and there is nothing to show that their assets were liquidated. There is nothing showing that the parent corporation did not continue to control the stock. Hence the subsidiaries continued to be members of the affiliated group. During the continuance of this status intercompany obligations are disregarded for the purposes of the tax. We are not called upon, therefore, to decide questions which would arise if the affiliated group were broken up by the dissolution of some of the members.

6. The petitioner seeks to increase invested capital by adding to surplus expenditures of both the two West Virginia corporations and their New York successors for patent development, applications for patents, and in litigation affecting patents, which had been charged to expense.

The expenditures of the West Virginia corporations were reflected in the value of the patents at the time they were transferred to the New York corporations. It is this value that the latter paid for, and there is no ground for adding thereto sums spent by the prior owner in bringing the patents to the state they were in when acquired by the New York corporations.

The testimony tends to show that the sums expended by the New York corporations were in their nature capital expenditures, but the evidence is insufficient to enable us to determine what part thereof, or that any of them, should be added to surplus in 1918 and 1919. The petitioner claims the full amount. The items making up the totals were identified in the corporations' books, by accountants, as having been spent for the purposes stated. However, just what the corporations got for the money expended is not disclosed. They did acquire many patents after 1903, but these expenditures are not connected up with any of those patents. Further, it is obvious that any patents thus acquired were exhausting with the lapse of time, and it is only the proportion of the cost representing their unexpired life in 1918 and 1919 that might be added to surplus in those years. We have no evidence of what their unexpired lives were in those years. Also a large part of the money was spent in litigation over patents, and it does not appear with what results. If any of the patents were declared invalid, the expenses connected with the litigation may not be included in invested capital.

7. Certain items of depreciable assets were not included in the petitioner's original returns and were also omitted by the Commissioner in recomputing depreciation. It is apparent to us that they were omitted in error, as the total cost of fixed assets shown in the balance sheet prepared by the revenue agent agrees with the amount now claimed by the petitioner. A list of the property omitted is set forth in the findings. The petitioner is entitled to depreciation on this property at the rates respectively used by the Commissioner for the petitioner's other property of the same kinds upon which depreciation has already been allowed.

*Judgment will be entered on 15 days' notice, under Rule 50.*

TRAMMELL: I dissent with respect to the limitation on intangibles in a class " B " affiliation.