## APPEAL OF OWENSBORO CONSERVE CO.

Docket No. 3462. Promulgated October 8, 1927.

1. The evidence in this proceeding is insufficient to enable the Board to determine what amount, if any, constitutes a reasonable deduction for amortization.

2. A net loss in 1919 of the petitioner corporation, which was affiliated with another corporation for a part of 1919, may not in the circumstances disclosed by the evidence be used to reduce petitioner's income for 1918 under the provisions of section 204 when it is not shown whether the consolidated group suffered a net loss or whether the petitioner suffered a loss for that part of 1919 when it was required to file a separate return, even though no portion of the net loss of petitioner sustained during the calendar year 1919 was not applied against the taxable income of the affiliated group for that portion of the year 1919 during which affiliation existed.

*C. J. McGuire, Esq.*, and *W. C. Magathan, Esq.*, for the petitioner.
*John D. Foley, Esq.*, for the Commissioner.

The Commissioner determined a deficiency of $43,660.34 in income and profits tax for 1918. Petitioner claims that the Commissioner erred in refusing to allow any deduction for amortization of its facilities, and in refusing to apply against its 1918 income a net loss suffered in 1919.

### FINDINGS OF FACT.

The petitioner is a Kentucky corporation with principal office at Owensboro. It was organized and incorporated in January, 1918, by P. J. Ritter Co., a corporation.

At that time the Ritter Company had its headquarters and a plant at Philadelphia and other plants at Bristol, Pa., Newark, Del., and Bridgeton, N. J. It was engaged in the manufacture of tomato catsup and the canning of pork and beans.

In 1917 one Strickler had a lease upon and option to purchase the assets of the Old Blue Grass Canning Co., of Owensboro, Ky., which was in bankruptcy. In that year the Ritter Company purchased a quantity of tomato pulp from Strickler, which was shipped from Owensboro for use in the business of the Ritter Company at Philadelphia.

In 1918 the petitioner was incorporated and purchased the assets of the Old Blue Grass Canning Co. It issued in payment therefor its notes for $40,000 and capital stock to Strickler of the par value of $30,000. The notes were subsequently paid. The balance of its stock, $70,000 common and $100,000 preferred, was issued to the Ritter

Company for $170,000 cash. The assets acquired upon such purchase were entered on the books as follows:

| | |
|---|---:|
| Land | $7,500 |
| Buildings | 57,500 |
| Power plant | 2,000 |
| Machinery | 2,000 |
| Crates | 1,000 |

The buildings purchased were frame structures without heating facilities and could be used only during warm weather. The only machinery in the plant was that used for packing tomato pulp.

At the time the petitioner corporation was organized the Ritter Company had Government contracts for catsup and pork and beans. It was anticipated that they would have orders to pack large amounts which could not be taken care of in their existing plants. Catsup production at the Newark plant was discontinued and the plant devoted entirely to the canning of pork and beans. Machinery was ordered for catsup production in the petitioner's plant and five lines were received and installed prior to August, 1918, when production began. In that year three of the five lines were used continuously during warm weather and the two additional lines were used when necessary to handle the deliveries of fresh tomatoes. After 1918 only two lines were ever used.

In June or July, 1918, petitioner ordered machinery for the manufacture of pork and beans. This was installed late in the fall and was not operated until February or March, 1919, when it was tested. It was used to some extent in 1924 and has not been used since that year.

The petitioner took no deduction for amortization as such in the return filed for the year 1918, but on or about June 30, 1922, it filed a claim for an amortization deduction from its 1918 income in the amount of $37,882.85. Claim for refund was filed on or about July 10, 1923. The property on which such amortization was claimed, together with its cost, was as follows:

| | | | |
|---|---:|---|---:|
| 3 Livingston washers | $750.00 | 3 storage tanks | $325.50 |
| 3 can fillers | 1,050.00 | 9 1,000-gallon unit tanks | 3,834.00 |
| 4 sealing machines | 1,800.00 | 4 2-ring upright upper tanks, | |
| 3 filling machines | 3,827.77 | pipes and feeds | 4,861.64 |
| 9 yellow labeling machines | 3,847.50 | 2 pully shafts and feeds | 7,250.00 |
| 4 operating pulpers | 1,410.00 | Brick work for installation | |
| Crowning machines | 2,700.00 | covering various costs | 10,449.44 |

This property includes all catsup machinery with the exception of two lines used subsequent to 1918. The pork-and-bean machinery cost $1,909.19.

Since 1917 petitioner has sold certain of its machinery and equipment on which amortization in 1918 is claimed. The following is

a complete list of the assets sold; the actual sales prices and the dates (by months and years) in which the sales were consummated:

| | | |
|---|---|---|
| November, 1919_____ | 2 Kern finishers_____ | $700. 00 |
| March, 1920_____ | 3 1,000-gallon wood cooking tanks, complete with Cookmore coils and plugs and steam trap. · | 1, 350. 00 |
| June, 1921_____ | 1 1,000-gallon cypress cooking tank with Langenkamo copper coil with outlet and plug without traps. | 175. 00 |
| August, 1922_____ | 1 Haller filler, complete with sterilizer_____ | 1, 027. 46 |
| August, 1922_____ | 8 Adriance crowners_____ | 804. 09 |
| August, 1922_____ | 3 Ermold labelers_____ | 1, 145. 83 |
| April, 1925_____ | 1 Haller catsup filler_____ | 500. 00 |
| July, 1923_____ | 1 machinery unit unidentified as to its nature_____ | 490. 88 |
| October, 1923_____ | 1 Hansen filler for No. 2 cans_____ | 550. 00 |
| May, 1925_____ | 2 Burt labelers_____ | 862. 00 |

The petitioner has the remainder of these assets. Some of them have been dismantled.

The production of catsup, stated in cases of 24 eight-ounce packages each, was as follows:

| Year | Cases | Year | Cases |
|---|---|---|---|
| 1918_____ | 171, 734 | 1922_____ | 62, 856 |
| 1919_____ | 211, 942 | 1923_____ | 53, 125 |
| 1920_____ | 226, 739 | 1924_____ | 87, 159 |
| 1921_____ | None. | | |

The quantity of tomato pulp on hand at the close of each year, stated in units of 5-gallon cans, was as follows:

| Year | 5-gallon cans | Year | 5-gallon cans |
|---|---|---|---|
| 1918_____ | 37, 848 | 1921_____ | None. |
| 1919_____ | 11, 524 | 1920_____ | None. |

The stock of catsup on hand at the close of each year, stated in cases of 24 eight-ounce bottles each, was as follows:

| Year | Cases | Year | Cases |
|---|---|---|---|
| 1918_____ | None. | 1922_____ | 22, 046 |
| 1919_____ | 9, 084 | 1923_____ | 21, 019 |
| 1920_____ | 95, 144 | 1924_____ | 35, 981 |
| 1921_____ | 20, 329 | | |

The pulp production, stated in units of 5-gallon cans, was as follows:

| Year | 5-gallon cans | Year | 5-gallon cans |
|---|---|---|---|
| 1918_____ | 63, 954 | 1922_____ | 38, 279 |
| 1919_____ | 11, 524 | 1923_____ | 9, 963 |
| 1920_____ | 36, 718 | 1924_____ | 51, 596 |
| 1921_____ | None. | | |

Tomatoes must be handled very promptly after receipt and reduced to pulp. The pulp can be carried over from one year to another but not for more than one year. Contracts were made by the petitioner to purchase tomatoes from certain amount of acreage from year to year, depending upon the anticipated demand. Such contracts are made in February and March and sometimes in April.

In 1918 a greater production was contemplated than took place. There had been shipped to the petitioner certain supplies such as bottles, sugar, and other ingredients. The cold weather came on and the plant was not heated for winter, making production impossible. These goods were held over and tomato pulp was stored until 1919 and put into catsup in that year. In 1918 the entire production took place during the tomato season, August, September, and a part of October. In 1919, due to a supply of pulp on hand from the previous year, the packing of catsup started before the tomato season opened. In 1919 there had been a general failure of the tomato crop in the East, but not in Kentucky. The plant of the petitioner was operated during all of the warm weather in that year. Late in the fall of that year the Ritter Company, which took the entire output of the petitioner, was able to make only partial deliveries on some of its orders.

The plant of the petitioner was operated as a branch of the Ritter Company. That company furnished all the capital, purchased all the goods produced, and dictated the production policy. After 1919 the eastern plants of the Ritter Company were able to take care of most of its business. That company sold its Newark and Philadelphia plants and at the time of the hearing was operating only the plant at Bridgeton, N. J. The Owensboro plant was not being operated. Most of the business of the Ritter Company is in and about Philadelphia.

After the entry of the United States into the World War in 1917, the United States Food Administration issued rules and regulations governing the manufacturers engaged in the manufacture of tomato soup, tomato catsup and other tomato products, other than canned tomatoes, limiting their production and sale except sales to the United States. Manufacturers of tomato soup, tomato catsup, and other tomato products were licensed by the Government. The petitioner received such a license.

The petitioner was affiliated with the Ritter Company from May 22, 1919, to December 31, 1919, and in subsequent years. They were not affiliated at any time prior to May 22, 1919. During the calendar year 1919, the petitioner sustained a net loss of $15,816.19. It is not known in what part of the year this loss actually occurred, i. e., whether before or after the date of affiliation between the petitioner and the Ritter Company. No part of the $15,816.19 has been taken as a deduction in computing the net taxable income of the affiliated companies.

### OPINION.

LITTLETON: It is contended by the petitioner that it acquired, after April 6, 1917, buildings and machinery for the production of articles contributing to the prosecution of the war and is entitled to

a reasonable allowance for the  amortization of their cost. The Commissioner denies that petitioner produced such articles or has established any basis for the computation of a deduction. We have set out in the findings all the facts established by the record. These are obviously insufficient upon which to determine what, if any, amount could be allowed as a reasonable deduction for amortization, even if, as petitioner contends, the production of tomato catsup was the production of an article contributing to the prosecution of the war.

The claim for amortization filed with the Commissioner covered only the catsup machinery. The petitioner claimed that of the five lines of machinery installed three were no longer used after 1918. It established the cost of the machinery which went to make up these three lines and the selling price of some of such machinery. The description of the property sold is so different, however, from the description of the machinery purchased, that it is impossible intelligently to compare cost and selling price on the record before us. The petitioner still has the machinery that was not sold. There is no showing of its postwar sales value or that any efforts were made to sell it. This does not constitute a sufficient record on which to determine the issue presented. At the hearing the petitioner also claimed that it was entitled to deduct amortization on its pork-and-bean machinery. The only proof with reference to such machinery was its cost. It also claimed the right to a deduction of amortization for the building which it purchased. The only proof with respect to the building is that it was purchased with other assets for $40,000 in notes and $30,000 of capital stock and was entered upon the books as having cost $57,500.

During the calendar year 1919 a net loss of $15,816.19 was sustained by the petitioner. From May 22, 1919, to December 31, 1919, the petitioner was affiliated with the P. J. Ritter Co. It was stipulated between the parties that it is unknown whether the loss occurred prior or subsequent to May 22, 1919, but that the loss was not used to reduce the taxable income of the affiliated group for the period from May 22, 1919, to December 31, 1919. The tax liability of the affiliated group for 1919 is not before the Board. The petitioner was not affiliated with any other corporation during 1918 when it had taxable income which it now seeks to have reduced to the extent of the aforementioned net loss in 1919 under the provisions of section 204 (b), Revenue Act of 1918, which reads in part as follows:

If for any taxable year beginning after October 31, 1918, and ending prior to January 1, 1920, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount of such net loss shall under regulations prescribed by the Commissioner with

the approval of the Secretary be deducted from the net income of the taxpayer for the preceding taxable year; * * *

The petitioner contends in effect that where one corporation in an affiliated group sustains a net loss in 1919 and this loss is not for any reason used to reduce the taxable income of the group, this net loss should be used to reduce the net income in 1918 of the corporation suffering the loss in 1919. This contention is advanced without any showing as to the ultimate status of the affiliated group for the period May 22, 1919, to December 31, 1919, i. e., whether a loss or gain was realized on the combined operations of the two companies outside of the net loss in question. We find ourselves unable to concur in this contention of the taxpayer. Whether the affiliated group claimed the benefit of the net loss of the petitioner during the period of affiliation in 1919 we think is immaterial to a decision of the claim herein presented. The Revenue Act of 1918 made specific provision for the determination of the taxable income of affiliated corporations on a consolidated basis. In *Farmers Deposit National Bank*, 5 B. T. A. 520, the Board said:

The effect of the consolidation of two or more companies is to weld them together for the purpose of computing the tax, as though they existed, in fact, as a single business enterprise. Their separate and distinct identities are merged in the interest of their community, just as effectively, so far as concerns the determination of the income and profits taxes, as though they existed under a single charter.

Also in the same opinion " consolidated net income " was defined as follows:

" Consolidated net income " means the gross income of the affiliated group, as defined in section 233, less the deductions allowed to the affiliated group by section 234.

And further in this opinion this statement appears:

And where, in other sections of the statute, Congress speaks of corporations as individual taxpayers, it means as to the sections dealing with consolidated units to treat the consolidated unit as a single corporation.

Therefore, in the determination of the consolidated net income, losses of members of the affiliated group allowable under section 234 should be offset against income of other members of the group in the same manner that losses on one branch of a single corporation's business may be offset against income from another branch or transaction. Whatever portion of the net loss of the Owensboro Conserve Co. was applicable to the period May 22, 1919, to December 31, 1919, during which that company was affiliated with the P. J. Ritter Co., operated under the statute to reduce the net income of the affiliated group and to that extent this petitioner is not entitled to carry that portion of its net loss so applied back to 1918 and apply it against

its net income for that year, for it is not the purpose of the statute to permit a double deduction. See *United States* v. *Ludey*, 274 U. S. 295. We have heretofore treated an affiliated group of corporations as one taxpayer for the purpose of determining the net income and invested capital under the statute. In *American La Dentelle, Inc.*, 1 B. T. A. 575, the Board said:

\* \* \* Until the conditions underlying the application of the special provisions of this section [240, Revenue Act of 1918] exist, the section can not be operative. The two corporations must maintain their separate incidents, therefore, at least until July 1, 1919, filing separate returns with separate computations of income and profits, for this period. \* \* \*

From July 1, 1919, however, Congress has said that the generally recognized principle of corporate identity was to be overridden for the purpose of the income and profits tax and that a consolidated return should be filed "if substantially all the stock of two or more corporations is owned or controlled by the same interests," which is the situation here. From July 1, in other words, the separate existences ceased for tax purposes just as effectually as if under a State statute the corporations had been consolidated for all corporate purposes. A new tax status was created. \* \* \*

See *Gould Coupler Co.*, 5 B. T. A. 499; *Farmers Deposit National Bank*, 5 B. T. A. 520; *G. M. Standifer Construction Corporation*, 4 B. T. A. 525.

The affiliated group is one taxpayer for the purpose of determining the net income, losses, deductions and invested capital. The allocation of the tax due upon the consolidated net income to the several members of the group relates to the matter of payment of the tax by the several units of the taxpayer group or to collection of the tax by the Government from the group in proportion to the consolidated net income properly assessable to each, but the members of the consolidated group are free to agree among themselves as to who shall pay the tax. To that extent it may be said that a member of an affiliated group under section 240 of the Revenue Act of 1918 is a "taxpayer," but in construing the provisions of section 204 of the Revenue Act of 1918 that "if \* \* \* it appears \* \* \* that any taxpayer has sustained a net loss, the amount of such net loss shall \* \* \* be deducted from the net income of the taxpayer for the preceding year" we must look to the entire Act and apply the provisions of this section consistently with other provisions of the statute. It is not to be supposed that Congress intended that a different rule should be applied under section 204 in the case of the net loss of a member of an affiliated group than should be applied in the case of consolidated corporations under the provisions of section 240. During the period of affiliation petitioner was a branch of a single business unit and the consolidated group, if any member of it had a net income, obtained the benefit of the net loss of the petitioner in the payment of the tax for that period, and the consolidated group would also benefit through

the saving of taxes by the application of the net loss of a member of the affiliated group in the reduction of the net income of such member for the preceding year when affiliation did not exist. This would seem to be contrary to the underlying purpose of the consolidated return section to prevent corporations from escaping the payment of a tax which would otherwise be due.

The Board is of the opinion therefore that before any net loss of a member of the affiliated group occurring in 1919 may be used to reduce the income, either of the group or the separate corporation in 1918, the ultimate effect of the loss on the consolidated group during the period of affiliation in 1919 when the loss occurred, must first be determined. Since it is not shown whether there was a net loss, either of the petitioner for the period January 1, 1919, to May 21, 1919, inclusive, when it was required to file a separate return, or of the affiliated group from May 22, 1919, to December 31, 1919, when a consolidated return was required, the Board is unable to determine what net loss, if any, should be used to reduce the net income of the petitioner for the calendar year 1918.

Reviewed by the Board.

*Judgment will be entered for the Commissioner.*

PHILLIPS, dissenting: Because I believe that the petitioner falls squarely within the words of the statute permitting the deduction of the net loss claimed, I find myself unable to agree with that portion of the prevailing opinion which disallows such net loss as a deduction.

It is stipulated that for 1919 the petitioner sustained a net loss of $15,816.19. Section 204 of the Revenue Act of 1918 provides, so far as material:

If for any taxable year beginning after October 31, 1918, and ending prior to January 1, 1920, it appears upon the production of evidence satisfactory to the Commissioner that *any taxpayer* has sustained a net loss, the amount of such net loss shall under regulations prescribed by the Commissioner with the approval of the Secretary be deducted from the net income of the taxpayer for the preceding taxable year; * * *. (Italics ours.)

The term taxpayer is defined in section 1 of the statute as including "any person, trust or estate subject to a tax imposed by this Act." By a further definition the term "person" includes corporations. This petitioner appears to meet the definition of a "taxpayer" and to fall squarely within the provisions of section 204 unless there is some other section which excludes it. The Commissioner contends that because during a part of 1919 this petitioner was affiliated with the Ritter Company and filed a consolidated return for a part of the year, a new taxpayer was created of the affiliated group, that so much of the net loss as occurred during the period of affiliation can not be claimed by this petitioner, and since there is nothing from

which we may determine when the loss was sustained, it may not be allowed. The pertinent provisions of the statute with reference to affiliated groups are:

SEC. 240. (a) That corporations which are affiliated within the meaning of this section shall, under regulations to be prescribed by the Commissioner with the approval of the Secretary, make a consolidated return of net income and invested capital for the purposes of this title and Title III, and the taxes thereunder shall be computed and determined upon the basis of such return: *Provided,* \* \* \*

In any case in which a tax is assessed upon the basis of a consolidated return, the total tax shall be computed in the first instance as a unit and shall then be assessed upon the respective affiliated corporations in such proportions as may be agreed upon among them, or, in the absence of such agreement, then on the basis of the net income properly assignable to each. \* \* \*

While the statute provides for a consolidated return of the income of two or more taxpayers and creates a new group for the purposes of computing the income, it still leaves the tax liability with the separate corporations forming the group. Although for a part of 1919, petitioner was a part of such an affiliated group, it was still " a person subject to a tax imposed by this Act " and as such is entitled to the deduction which is given in express terms to all taxpayers.

I appreciate that there may result a deduction of the same loss by the petitioner in 1918 and by the affiliated group in 1919 and that such a result should only be reached if expressly authorized by the statute. In this case it appears that the terms of the statute are clear, that this taxpayer falls squarely within them, and that the deduction of the net loss suffered by it in 1919 should be allowed in 1918. It may well be that Congress did not have this situation in mind and would have provided otherwise had the matter been expressly called to its attention. It is not our province, however, to deny by statutory construction a deduction given to a taxpayer by the express terms of the taxing statute.