*Decisions will be entered under Rule 155.*

' *INTERNATIONAL TELEPHONE & TELEGRAPH CORPORATION AND AFFILIATED COMPANIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT*

Docket No. 7990–75.     Filed July 9, 1981.

*Supplemental Opinion appears at 77 T.C. 1367 (1981).

*Stephen D. Gardner, Abraham N. M. Shashy, Jr.*, and *Robert
A. Kagan*, for the petitioners.
*Joan Ronder Domike*, for the respondent.

OPINION

TANNENWALD, *Chief Judge*: Respondent determined a deficiency in petitioners' income tax for 1965 of $885,064. Concessions have been made by both parties, but several issues remain. The first two, relating to the limitation on the foreign tax credit, are:

(1) Whether the foreign source operating losses of certain foreign corporations, affiliated with International Telephone

& Telegraph Corp. (ITT) and included in a consolidated return filed by that corporation and its affiliates (ITT Group), must be taken into account in determining the consolidated foreign source taxable income of the group.

(2) Whether certain deductions resulting from service fee and interest payments by members of the ITT Group to other members of that group during the taxable year should be allocated to domestic source gross income or should be apportioned to foreign source gross income, according to the gross-to-gross method, in determining the consolidated foreign source taxable income of the group.

The other issues presented, relating to convertible debentures of two subsidiaries of ITT which were exchanged for ITT stock and subsequently retired by the subsidiaries, are:

(1) Whether the exchanges for, and subsequent retirement of, the debentures by the subsidiaries were an integral part of the plans of reorganizations under section 368(a)(1)(C)[1] under which ITT acquired the subsidiaries and were therefore nonrecognizable transactions.

(2) If not, whether ITT or its subsidiaries recognized any loss thereby.

This case was submitted as fully stipulated pursuant to Rule 122, and the stipulation of facts and exhibits are incorporated herein by this reference.

ITT, a Delaware corporation with its principal place of business in New York, N.Y., is the common parent of the ITT Group, an affiliated group of domestic corporations as defined in section 1504(a). Petitioners other than ITT were includable corporations, as defined in section 1504(b), of said affiliated group.

The ITT Group timely filed a consolidated Federal income tax return with the Internal Revenue Service, Manhattan District, showing no tax liability.

---

[1] Section references, unless otherwise indicated, are to the Internal Revenue Code of 1954 as amended and in effect in 1965. Similarly, references to portions of sec. 1.1502 of the Income Tax Regulations which contain the letter "A" are to the provisions of those regulations in effect during 1965.

Unless otherwise indicated, any referance to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.

*Issue 1. Foreign Tax Credit—Foreign Operating Losses*

During the taxable year 1965, members of the ITT Group realized both domestic source gross income and foreign source gross income.[2] See secs. 861(a) and 862(a). With respect to the foreign source gross income, various members of the ITT Group paid, or are deemed to have paid, foreign income taxes for which the ITT Group elected to claim a foreign tax credit, subject to the overall foreign tax credit limitation of section 904(a). See also sec. 1.1502–43A(c)(2), Income Tax Regs. The foreign tax credit is structured so as to mitigate the burdens of double taxation of foreign income of domestic corporations (*American Chicle Co. v. United States*, 316 U.S. 450, 451 (1942)), in a manner "designed to prevent the amount of foreign taxes credited from offsetting U.S. tax on the taxpayer's domestic income." *Grunebaum v. Commissioner*, 50 T.C. 710, 717 (1968), affd. 420 F.2d 332 (2d Cir. 1970).

In general, section 901(a) permits U.S. corporations which derive foreign source income to elect to credit taxes paid or accrued to foreign jurisdictions with respect to that income against their U.S. income liability. The credit is limited, however, by the provisions of section 904(a). Petitioners elected the "overall limitation" of section 904(a)(2), which restricts the credit to—

$$\frac{\text{Foreign source taxable income}}{\text{Worldwide taxable income}[3]} \times \text{ U.S. tentative tax}$$

(hereinafter sometimes referred to as the pertinent fraction), where the U.S. tentative tax is the liability computed without the benefit of any credit under section 901. *Theo. H. Davies & Co. v. Commissioner*, 75 T.C. 443, 444 (1980).

The provisions under which affiliated groups may claim the foreign tax credit, set forth in section 1.1502–43A, Income Tax

---

[2]The term "domestic source gross income" will be used as shorthand for "gross income from sources within the United States," which is actually the term defined in sec. 861(a). Similarly, the term "foreign source gross income" refers to "gross income from sources without the United States," defined in sec. 862(a). A comparable "source" shorthand expression will be used in defining taxable income from sources from within/without the United States, as used in secs. 861(b) and 862(b), respectively.

[3]Worldwide taxable income is equal to taxable income under sec. 63.

Regs., mirror the more general provisions applicable to nonaffiliated corporations. Subsection (a)(1) of that section offers the choice of a credit or deduction (compare sec. 901(a)), whereas subsection (c)[4] corresponds to the election of the overall limitations provided for in section 904(a)(2). Thus, the applicable limitation on the foreign tax credit becomes—

$$\frac{\text{Consolitated foreign source taxable income}[5]}{\text{Worldwide taxable income}} \times \text{U.S. tentative tax}$$

where the tentative tax is the group's U.S. tax liability calculated without the benefit of the foreign tax credit and the denominator is "consolidated taxable income" as defined in section 1.1502–31A, Income Tax Regs. It is the determination of the numerator which is in dispute in both foreign tax credit issues before us.

Several members of the ITT Group which had foreign source gross income for the taxable year incurred foreign source operating losses. Petitioners did not include these foreign source operating loss members in calculating their consolidated foreign source taxable income (the numerator of the pertinent fraction) for purposes of the foreign tax credit limitation under section 904(a)(2). Respondent determined that the ITT Group should have included these foreign source operating losses in the numerator of the pertinent fraction in order properly to calculate its foreign tax credit limitation.[6]

---

[4]The parties agree that the provisions of sec. 1.1502–43A(d), Income Tax Regs., regarding "consolidated taxable interest income," are not involved herein. See sec. 904(f)(2)(C).

[5]I.e., consolidated taxable income from source without the United States. See note 2 *supra.*

[6]Both parties are in agreement that the losses of those members should be included in the denominator of the pertinent fraction. They have also agreed, as part of a comprehensive stipulation, that, for the purposes of this case, the calculation of foreign source taxable income should be made separately for each corporation rather than on an aggregate basis, with the result that we are not confronted with the separate versus aggregate issue (and therefore express no opinion thereon) decided by *International Telephone & Telegraph Corp. v. United States,* 221 Ct. Cl. 442 608 F.2d 462 (1979), after the submission and completion of briefing of the instant case, in which the Court of Claims held that the aggregate basis should be employed. We recognize, of course, that we are not necessarily bound by the stipulation of the parties on what is essentially a question of law. See *Estate of Sanford v. Commissioner,* 308 U.S. 39, 51 (1939); *Gaddy v. Commissioner,* 38 T.C. 943, 951 (1962). However, under the particular circumstances of this case, we are not inclined, sua sponte, to ignore the stipulation as to the separate versus aggregate issue. Cf. *Kampel v. Commissioner,* 72 T.C. 827, 830 (1979), affd. 634 F.2d 708 (2d Cir. 1980). In this context, we can appropriately deal with the operating losses of the members of the ITT Group (all of which had only gross

In arguing that we should exclude from the numerator those members of the ITT Group which incurred foreign source operating losses, petitioners primarily rely upon the last sentence of Rev. Rul. 72–281, 1972–1 C.B. 285. This ruling discusses the computation of the consolidated limitation on the foreign tax credit, under the regulations effective only for those taxable years beginning after December 31, 1965 (see note 6 below), where a member of the affiliated group incurs expenses not definitely allocable to either foreign or domestic gross income. The last paragraph of the ruling concludes:

> Accordingly, for purposes of computing the consolidated limitation on the foreign tax credit, the numerator of the applicable limiting fraction, under section 904(a) of the Code (consolidated taxable income from foreign sources), should be determined by allocating expenses of each member of the group which cannot be allocated to some item or class of domestic or foreign sources income on the ratio of foreign gross income to total gross income of each company of the group (separate company ratio). Thus, gross income and expenses of members of the group that do not have income from foreign sources are not included in this computation.

Petitioners argue that the last sentence requires us to conclude that those members without foreign source taxable income should be excluded from the numerator of the pertinent fraction. In so doing, petitioners take the sentence out of context and ignore the remainder of the ruling, which makes it clear that the computation referred to is the apportionment pursuant to section 1.861–8, Income Tax Regs. (via sec. 1.862–1(b), Income Tax Regs.), not the inclusion of the member with foreign source losses in the numerator of the limiting fraction. The fact that the sentence uses the clause "do not have income" does not, in our opinion, mean "do not have taxable income." The opening phrase of the sentence uses the phrase "gross income," and we think that the clause in question should be similarly qualified. Consequently, the sentence in question merely states the obvious, i.e., that members without

income from foreign sources and expenses directly attributable thereto) and need not concern ourselves with the breakdown of the items of income and expenses involved. We also note that respondent's regulations effective for taxable years commencing with 1966 provide specifically for the computation to be made on a separate rather than aggregate basis. See secs. 1.1502–4(d)(1), 1.1502–0(a), Income Tax Regs.

foreign source gross income need not allocate their "not definitely allocable expenses" to foreign source income.[7] Consequently, although we would not, in any event, be bound by Rev. Rul. 72–281, *supra* (cf. *Theo. H. Davies & Co. v. Commissioner, supra* at 449), we conclude that petitioners' reliance thereon is totally misplaced.[8]

Petitioners' alternative argument to exclude the members of the ITT Group which incurred foreign source operating losses from the computation of consolidated foreign source taxable income is specious. They contend that their method, which allocates foreign operating losses to offset domestic source income, is as reasonable as respondent's, which allocates such losses to foreign source income, in the absence of a specific regulation. Such an argument totally misconstrues the purpose of the foreign tax credit; it would have the effect of offsetting U.S. tax on domestic income. See p. 63 *supra*. See also *Theo. H. Davies & Co. v. Commissioner, supra* at 450, and cases cited thereat.

Moreover, petitioners' position ignores the nature of a consolidated return, i.e., that losses of one member of the affiliated group can be used to offset gains of another. They have elected this privilege in calculating their taxes and have (or might have) benefited from it in calculating their worldwide consolidated taxable income. See sec. 1.1502–31A, Income Tax Regs. It is well established that the numerator and the denominator of the pertinent fraction are to be calculated on the same basis. *Theo. H. Davies & Co. v. Commissioner, supra* at 449. See *Grunebaum v. Commissioner*, 420 F.2d 332, 333 (2d Cir. 1970), affg. 50 T.C. 710 (1968); *Federated Mutual Implement & Hardware Ins. Co. v. Commissioner*, 29 T.C. 262 (1957), affd. 266 F.2d 66 (8th Cir. 1959). See also note 11 *infra*. Thus,

---

[7] We note further that the holding of Rev. Rul. 72–281, 1972–1 C.B. 285, i.e., that the separate company ratio is to be used in computing the numerator of the pertinent fraction, undercuts petitioner's position on the second foreign tax credit issue. See pp. 67 to 72 *infra*.

[8] In point of fact, the members of the ITT Group which had foreign source operating losses had foreign source gross income and all their expenses were *definitely* allocable thereto, with the result that Rev. Rul. 72–281 is simply not applicable herein. We further note that we express no opinion as to the includability in the numerator of the pertinent fraction of the foreign source operating losses of any member of a consolidated group which had no foreign source gross income and expenses which, if there had been such income, would have been directly allocable thereto.

they must include the members of the ITT Group having foreign source operating losses in calculating consolidated foreign source taxable income, i.e., the numerator of the pertinent fraction.[9] *International Telephone & Telegraph Corp. v. United States*, 221 Ct. Cl. 442, 608 F.2d 462, 468–469 (1979) (dicta).

## Issue 2. Allocation of Intercompany Payments

During the taxable year, ITT Credit Corp. (ITT Credit) rendered services to ITT for which it received a service fee. ITT Credit reported the service fee as gross income and ITT properly claimed it as a deduction. ITT Credit treated the service fee as domestic source gross income, while ITT (which had both domestic source and foreign source income) treated it as a deduction definitely allocable to domestic source gross income in calculating its foreign source taxable income. Respondent determined that the service fee was an expense of ITT's which was not definitely allocable to either domestic or foreign source gross income. He therefore apportioned the expense against ITT's foreign source gross income in accordance (so he claims) with section 862(b) and sections 1.862–1(b) and 1.861–8, Income Tax Regs. Petitioners disagree with this treatment.

The parties have a similar disagreement as to the proper treatment of interest paid by two members of the ITT Group to two other members of the group. The interest was paid by the debtor corporations on funds advanced them and pooled with other funds at their disposal in their worldwide operations. Each debtor corporation had both domestic source and foreign source gross income. Petitioners allocated all of the interest payments to the debtors' domestic source gross income, whereas respondent apportioned part of the interest expense against foreign source income, again in accordance (so he claims) with section 862(b) and sections 1.862–1(b) and 1.861–8, Income Tax Regs.

We agree with respondent as to each of his determinations

---

[9]Neither party has argued that such foreign source operating losses should be excluded from the denominator of the pertinent fraction (as apparently they were not), and we express no opinion as to that issue. Cf. *Duke v. Commissioner*, 34 T.C. 772 (1960). See note 6 *supra*.

of the numerator of the pertinent fraction. See sec. 1.1502–43A, Income Tax Regs.

Petitioners start from the premise, which is correct, that neither the consolidated return regulations nor any decided case deals directly with the allocation issue presented herein. Such being the case, petitioners argue that we should apply the general policy underpinning the sections of the Internal Revenue Code dealing with consolidated returns and the regulations thereunder, which they claim dictates that the consolidated group be treated as a single entity,[10] and treat the situations as if the members of the ITT Group (other than ITT) were branches of ITT. On this basis, petitioners urge us to conclude that the service fee and interest payments in question are properly allocable in their entirety to the domestic source gross income of the payor members of the ITT Group. Or, to put it another way, were only branches involved, the net effect would be a complete offset of the items in question, with their consequent elimination in the computation of the denominator of the pertinent fraction, i.e., "worldwide consolidated taxable income." According to petitioners, the same offset should also obtain in the computation of the numerator of the pertinent fraction, i.e., "consolidated taxable income from sources without the United States." Alternatively, or as part of the foregoing line of reasoning, petitioners argue that the nature of a consolidated return requires consistent treatment of intercompany payments, i.e., if the payee reports the income as domestic source income, then the payor should claim the expense as domestic source expense as well, because they constitute a single entity.

Admittedly, and particularly in light of our analysis in respect of foreign source operating losses, the petitioners' argument has a superficial appeal, at least to the extent that it rests on the proposition that "the numerator and denominator of the pertinent fraction are to be calculated on the same basis." See pp. 66–67 *supra*. The fact of the matter, however, is that such proposition does not rest on the "net effect" of the inclusion or exclusion of items in the numerator and/or

---

[10]See *Owensboro Conserve Co. v. Commissioner*, 8 B.T.A. 615 (1927); *Farmers Deposit National Bank v. Commissioner*, 5 B.T.A. 520 (1926); *Gould Coupler Co. v. Commissioner*, 5 B.T.A. 499 (1926).

denominator of the pertinent fraction. Rather, the proposition looks to the inclusion or exclusion of items of income and expense[11] required by sections 861, 862, and 863, after which the appropriate foreign tax credit is calculated. In the instant situation, we are required to apply the provisions of section 862(b). See also sec. 1.1502–43A(c), Income Tax Regs. Indeed, petitioners do not argue otherwise; they merely advance a different method of application from that utilized by respondent. See also secs. 1.1502–2A(f), 1.1502–31A, Income Tax Regs.

Sec. 862(b) provides:

(b) TAXABLE INCOME FROM SOURCES WITHOUT UNITED STATES.—From the items of gross income specified in subsection (a) there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto, and a ratable part of any expenses, losses, or other deductions which cannot definitely be allocated to some item or class of gross income. The remainder, if any, shall be treated in full as taxable income from sources without the United States. * * *

In the instant situation, the members of the ITT Group which paid the service fee and interest had both domestic source and foreign source gross income. There is nothing in the record of this fully stipulated case which can possibly form the basis for concluding that the items of expense in question can "definitely be allocated" to either source. See secs. 861(b) and 862(b). Such being the case, we are led inexorably to the conclusion that those items must be "apportioned or allocated" to the foreign source income of the payor members of the ITT Group, and petitioners' attempt to match the source allocation of expenses by the payor to the treatment of the item as

---

[11]Indeed, as we see it, aside from certain enumerated exceptions not applicable herein, the concept that intercompany transactions are eliminated in computing consolidated income generally means only—at least in the context of the foreign tax credit computations—that an item of income recognized by one member of the consolidated group may, in the final analysis, be effectively offset by an expense deduction taken by another member of the group (excluding any profit or loss in the intercompany transaction), not that the items are in fact eliminated from the computation. See F. Peel, Consolidated Tax Returns 1–2, 129–131 (1st ed. 1959). This is implemented in the consolidated return regulations by sec. 1.1502–31A(a)(1) and (b)(1), Income Tax Regs., which requires the separate computation of the taxable income of each member of the group. Petitioners have agreed that this procedure should be applied as well to the computation of the foreign tax credit. See note 6 *supra*.

income by the payee must therefore fail. *Grunebaum v. Commissioner*, 50 T.C. 710 (1968).[12]

We disagree with petitioners that the following example which they discuss on brief requires a contrary conclusion. Let X and Y be domestic affiliated corporations filing a consolidated return. During the year, X made a $15 payment to Y for services rendered, X's only deduction. X derived $5 of its total gross income of $50 from foreign sources and paid foreign taxes with respect to that income. Y's gross income, without regard to the payment by X, was $70, all of which was domestic source income. Y had deductions of $40 for the year. The consolidated taxable income of the group, the denominator of the pertinent fraction, would be $80. The $15 payment from X to Y is domestic source income to Y. Sec. 861(a)(3). If the $15 payment is allocable to X's domestic source income, the pertinent fraction would be 5/80, or 6.25 percent. If, however, the payment was a not definitely allocable expense of X, then the foreign source taxable income of X becomes 3.5,[13] and the pertinent fraction becomes 3.5/80, or 4.375 percent.

Petitioners go on to argue that if X and Y were branches of a single corporation, C, then C's worldwide taxable income (assuming C had no other income or expenses) would be $80 (gross income of $120 less $40 in expenses). C's foreign source taxable income, they explain, would be $5. It would not be reduced by an apportionment of the $15 service fee, which, they argue, constitutes neither gross income to Y nor an expense item of X for tax purposes. Petitioners are wrong. While C's foreign source gross income would be $5, its foreign source taxable income would be less.

Just as the $15 paid by X to Y has lost its identity, for tax purposes, so too does the character of the $40 in expenses incurred by Y. Assuming Y had expenses in providing the services to X, those expenses are no longer definitely allocable in their entirety by Y, or C, to domestic sources. Thus, C must apportion those expenses it incurred (through Y) which are not

---

[12]Cf. *Dowell v. Commissioner*, T.C. Memo. 1977–101.

[13]The expenses apportioned against foreign source gross income are the product of the not definitely allocable expense (15) and the gross-to-gross formula (5/50). This product (1.5) is then subtracted from foreign source gross income. See secs. 1.861–8, 1.862–1(b), Income Tax Regs.

definitely allocable to domestic or foreign source gross income. The net effect is that the foreign tax credit limitation would be less than the 6.25 percent of the tentative tax liability that petitioners assert. Thus, contrary to petitioners' contention, even if we were to treat the members of the ITT Group as branches of a single corporation, that entity would be required to apportion some of its expenses against foreign source income.

Finally, petitioners argue that we should allocate all of the interest and service fees to domestic source gross income under the de minimis rule of *F. W. Woolworth Co. v. Commissioner*, 54 T.C. 1233 (1970). Our decision in *Woolworth* was influenced by respondent's proposed regulations under section 1.861–8, Income Tax Regs., which provided that a deduction was definitely allocable to a class of gross income if it were incurred "in whole or in material part as a result of, or incident to, the activities from which such income [was] derived." See 54 T.C. at 1270. We concluded that, because 96 percent of the taxpayer's gross income was from domestic sources and therefore 96 percent of the deductions would be allocated accordingly, *a material part* of the deductions were incurred as a result of activities producing domestic source income. Thus, no allocation was made.

The *Woolworth* case is clearly distinguishable on two grounds. First, the ratio of foreign source gross income to worldwide gross income is larger for each of the members of the ITT Group involved herein in comparison with *Woolworth*. Without drawing the precise line, we hold that 6.525 percent is not de minimis, let alone 15.9304 or 19.0407 percent[14] — especially when the statute in question calls for apportionment. Moreover, in *Woolworth*, the implication was that these expenses would have been incurred regardless of the foreign source income. We can reach no such conclusion on the basis of this record.

In sum, the service fee and interest expenses must be apportioned and respondent's determination in this respect is sustained.

---

[14]Petitioners, for the purposes of the de minimis argument, accept respondent's allocation of 93.475 percent of the service fee and 84.0696 percent and 80.9593 percent, respectively, of the two interest payments to the domestic source income of the payor members.

### Issue 3. Convertible Debentures

On August 31, 1964, ITT Aetna Finance Co. (ITT Aetna), a member of the ITT Group, acquired all of the assets of Aetna Finance Co. (Aetna), not a member of the ITT Group, in a reorganization qualifying under section 368(a)(1)(C). Pursuant to the terms of that reorganization, ITT issued to Aetna one "unit" of ITT shares[15] for each share of Aetna common stock outstanding at the closing. At the time of this acquisition, Aetna had outstanding certain 5⅝ percent convertible subordinated debentures (debentures) which were convertible into Aetna common stock at the rate of 65 shares for each $1,000 face amount of debentures. Pursuant to the terms of a first supplemental indenture, dated August 31, 1964, entered into between ITT Aetna, ITT, and St. Louis Union Trust Co. in connection with this reorganization, ITT Aetna assumed the debt obligations of Aetna under these debentures. Additionally, in lieu of the original conversion feature of the debentures into Aetna stock, ITT became obligated to exchange ITT common and series E preferred stock for any debenture then outstanding upon request by a debenture holder, as follows: 65 "units" (see note 15 below) for each $1,000 face amount of debentures.

In 1965, ITT acquired, directly from Aetna debenture holders, $482,000 face amount of debentures in exchange for ITT common and series E preferred stock pursuant to the terms of the supplemental indenture. The fair market value of ITT common and series E preferred stock which was exchanged for those debentures totaled $552,032 on the exchange dates. Thereafter, ITT Aetna retired $426,000 face amount of such debentures by a cash payment in this amount to ITT. ITT Aetna was solvent throughout 1965. The $426,000 payment was not reflected on petitioners' consolidated Federal income tax return. The debentures so retired had been acquired by ITT in exchange for ITT stock having a total fair market value of $461,372 on the dates of the exchanges.

Petitioners contend that ITT had an adjusted tax basis of $461,372 in the debentures so retired. Petitioners further

---

[15]One "unit" of ITT shares issued to Aetna consisted of 0.22080 share of ITT common stock and 0.05581 share of ITT series E cumulative preferred stock.

contend that the retirement of these debentures resulted in a capital loss in the amount of $35,372 to ITT (or ITT Aetna), measured by the difference between $461,372 and the amount received upon retirement ($426,000).

Similarly, on July 22, 1965, ITT Avis, Inc. (ITT Avis), a member of the ITT Group, acquired all of the assets of Avis, Inc. (Avis), not a member of the ITT Group, in a reorganization qualifying under section 368(a)(1)(C) of the Code. Pursuant to the terms of that reorganization, ITT issued to Avis one unit of ITT shares[16] for each share of Avis common stock outstanding at the closing. At the time of this acquisition, Avis had outstanding certain 6-percent subordinated convertible debentures and 5½-percent subordinated convertible debentures (debentures). Pursuant to the terms of first supplemental indentures, dated July 22, 1965, entered into between ITT Avis, ITT, and Chemical Bank New York Trust Co. and ITT Avis, ITT, and Irving Trust Co., respectively, in connection with this reorganization, ITT Avis assumed the debt obligations of Avis under these debentures. Additionally, in lieu of the original conversion feature of the debentures into Avis stock, ITT became obligated to exchange ITT common and series F preferred stock for any debenture then outstanding upon request by a debenture holder, the number of shares so exchanged to equal the number of "units" (see note 16 below) that the holder of each such debenture would have received had he converted his debenture in full into common stock of Avis immediately prior to Avis' transfer of substantially all of its assets to ITT Avis.

In 1965, ITT acquired, directly from Avis debenture holders, $657,900 face amount of 5½-percent debentures in exchange for ITT common and series F preferred stock pursuant to the terms of the supplemental indentures. In 1965, ITT also acquired, directly from Avis debenture holders, $266,000 face amount of 6-percent debentures in exchange for ITT common and series F preferred stock pursuant to the terms of the supplemental indentures. The fair market value of ITT common and series F preferred stock exchanged for these debentures totaled $2,125,246 on the exchange dates. These

---

[16]One "unit" of ITT shares issued to Avis consisted of 0.1375 share of ITT common stock and 0.1 share of ITT series F cumulative preferred stock.

debentures were thereafter retired by ITT Avis. As an alternative to receiving a cash payment from ITT Avis in the face amount of those debentures at the time they were retired, and subsequently contributing that cash to the capital of ITT Avis, ITT increased its capital account reflecting its investment in ITT Avis by a total of $923,900, the face amount of the debentures retired. ITT Avis was solvent throughout 1965. The $923,900 adjustment was not reflected on petitioners' consolidated Federal income tax return.

Petitioners contend that ITT had an adjusted tax basis of $2,125,246 in the debentures so retired. Petitioners further claim that the retirement of these debentures was equivalent to a redemption at face value for cash immediately followed by a capital contribution of this amount by ITT to ITT Avis. Therefore, petitioners contend that retirement of these debentures resulted in a capital loss in the amount of $1,201,346 to ITT (or ITT Avis) measured by the difference between $2,125,246 and the amount credited on retirement ($923,900). Petitioners further claim that, in the event ITT is treated as having contributed the Avis debentures to ITT Avis, the difference between $2,125,246 and the amount of the capital contribution ($923,900), or $1,201,346, is deductible by one or the other as a loss.

Petitioners and respondent have stipulated that the acquisition of substantially all of the assets of Aetna and Avis by ITT Aetna and ITT Avis, respectively, constituted reorganizations qualifying under section 368(a)(1)(C).[17] Respondent divides his contentions into two parts. First, he contends that the exchanges of debentures for ITT stock and the subsequent retirement of the debentures by the ITT subsidiaries were an integral part of the plans of reorganization. Consequently, respondent argues that ITT would not recognize loss on its disposition of the debentures. See sec. 361(b)(2). Second, respondent contends that, even if his first argument is rejected, and the conversion by the debenture holders and the subsequent disposition of the debentures by ITT is not part of

---

[17]See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.14, p. 14–53 (4th ed. 1979), for a discussion of possible complications resulting from the split assumption of the debt obligations of the debentures by ITT Aetna and ITT Avis and of the convertibility feature thereof by ITT.

the reorganization, petitioners should be denied any deduction by either ITT, on the one hand, or ITT Aetna or ITT Avis, on the other, either on the grounds that ITT made a contribution to the capital of ITT Aetna and ITT Avis, respectively or, alternatively, because of the application of section 1.1502–41A(b), Income Tax Regs. We will deal first with the question of the scope of the reorganization.

Petitioners do not argue that ITT's assumption of the obligation to honor the convertibility provision of the original Aetna and Avis debentures by substituting its own stock as the medium of exchange was not part of the plan of reorganization. They disagree with respondent, however, that the later exchanges and the transactions with ITT Aetna and ITT Avis involving the debentures obtained through those exchanges were part of the plan of reorganization. On this score, we agree with petitioners. We start with section 1.368–2(g), Income Tax Regs., which provides that the term "plan of reorganization"—

has reference to a consummated transaction specifically defined as a reorganization under section 368(a). The term is not to be construed as broadening the definition of "reorganization" as set forth in section 368(a), but is to be taken as limiting the nonrecognition of gain or loss to such exchanges or distributions as are directly a part of the transaction specifically described as a reorganization in section 368(a). Moreover, the transaction, or series of transactions, embraced in a plan of reorganization must not only come within the specific language of section 368(a), but the readjustments involved in the exchanges or distributions effected in the consummation thereof must be undertaken for reasons germane to the continuance of the business of a corporation a party to the reorganization. Section 368(a) contemplates genuine corporate reorganizations which are designed to effect a readjustment of continuing interests under modified corporate forms.

Obviously, the above definition is imbued with qualities of flexibility and vagueness, with the result that it does not present precise self-executing guidelines; the result has been the development of several doctrines sometimes couched in terms of "integrated," "interdependent," or "step," as contrasted with "independent," transactions. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.11–14.12, pp. 14–30 to 14–32 (4th ed. 1979); E. Manning, "'In Pursuance of the Plan of Reorganization': The Scope of the Reorganization Provisions of the Internal Revenue Code," 72 Harv. L. Rev. 881, 896–910 (1959). We think

it unnecessary to dissect the multitude of decisions dealing with the issue as to whether certain transactions were, or were not, part of, or pursuant to, a "plan of reorganization." We note, however, that we said, at a very early date (*Lashar v. Commissioner*, 34 B.T.A. 768, 777 (1936))—

> We have held in a number of cases that not every transaction which takes place as a consequence of a reorganization or which is provided for in an agreement embodying a plan of reorganization is to be treated for tax purposes as a part of a statutory reorganization. It is only those transactions which form an essential part of the reorganization that are to be so treated. * * *

The fact that ITT assumed the conversion obligation as part of the plans of reorganization does not mean, as respondent contends, that the subsequent conversions and retirement of the debentures were also part of the reorganizations. The debenture holders were clearly not obligated to present their bonds for conversion into ITT stock. Cf. *Commissioner v. Gordon*, 391 U.S. 83, 96 (1968); *McDonald's of Zion, 432, Ill., Inc. v. Commissioner*, 76 T.C. 972 (1981). While financial considerations may have made conversion a lucrative proposition, the holders were free to decide whether to convert at that time, later, or not at all. Compare *Hanover Bank v. Commissioner*, 369 U.S. 672 (1962). Moreover, we have nothing in the record to indicate that petitioners forced conversion, e.g., by having the subsidiaries call the debentures for redemption with the required notice.[18] In short, none of the factors which might support respondent's position are present herein, i.e., the existence of a binding agreement or other factors indicating that conversion was an integral part of the plans of reorganization.

In *Ward v. Commissioner*, 29 B.T.A. 1251 (1934), affd. 79 F.2d 381 (8th Cir. 1935), the taxpayers agreed to exchange common and preferred stock of A corporation for stock in B corporation, which further agreed to purchase, upon taxpayers' demand, all of its stock exchanged for A preferred stock and part of it exchanged for A common stock. Shortly after the contract was

---

[18]No inference should be drawn that the presence of this factor would mandate a contrary result. See *Fifth Avenue Bank of New York v. Commissioner*, 31 B.T.A. 945, 950 (1934), affd. on other issues 84 F.2d 787 (3d Cir. 1936). Its absence, however, supports our conclusion that the debenture holders were not compelled to convert their holdings pursuant to the plan or reorganization. See also note 19 *infra*.

made, the taxpayers gave notice that repurchase would be demanded. The stocks were delivered and, 2 days later, B repurchased the stock. We held that there were two separable transactions: an exchange of stock for stock on which gain was not recognized, followed by a sale of the stock so received. Once the stock had been transferred to the shareholders, the bilateral obligations of the contract had been discharged. The shareholders were not obligated to sell their stock back to B.

*Fifth Avenue Bank of New York v. Commissioner*, 31 B.T.A. 945 (1934), affd. on other issues 84 F.2d 787 (3d Cir. 1936), involved substantially similar circumstances, except that a subsidiary of the acquiring corporation agreed to purchase the shares following the stock-for-stock acquisition.[19] Despite the fact that over 99 percent of the shareholders (including the taxpayer) sold their shares to the subsidiary, we found that the transaction was a tax-free exchange (with a consequent carryover of basis) followed by a sale. Our holding was founded on the conclusion that the option did not bind the shareholders to sell; they were free to hold the shares, seek another market for them, or accept the offer.

If anything, we believe the facts in the instant case are more compelling than in *Ward* or *Fifth Avenue Bank*. In a B reorganization, the acquiring corporation eventually must deal directly with the shareholders, or their representatives, to complete the stock-for-stock acquisition. In a C reorganization, however, the shareholders (qua shareholders, thereby excluding officers and directors acting in those capacities) need not ever deal directly with the acquiring entities. The debenture holders, with whom we are here concerned, are one step further removed; the sole contact on their behalf was, in each case, the indenture trustee. While the trustee could act to protect their interests, it could not obligate them to convert. Such a decision rested with the debenture holders alone. Furthermore, unlike the situations in *Ward* and *Fifth Avenue Bank*, we have no evidence that the debenture holders were ever approached to convert their bonds, much less that they had so agreed or obligated themselves at any point prior to or at the time of the asset acquisition.

---

[19]The subsidiary made this offer prior to the acquisition of the stock by the parent. The offer remained open only 10 days after the consummation of the plan.

We find respondent's efforts to distinguish *Ward* and *Fifth Avenue Bank* unpersuasive, and that the authorities upon which he relies have only tangential and inconclusive relevance.

In sum, the conversions were not an essential part of the respective plans of reorganization; the asset acquisitions pursuant to such plans were in no way dependent upon the conversions which took place as the result of subsequent unilateral decisions made by the respective debenture holders.[20]

Having found that the conversions of the Aetna and Avis debentures into ITT stock were separate and independent transactions outside the respective plans of reorganization, we conclude that it follows that the subsequent retirements of the debentures were also outside of those plans. Thus, respondent's argument that those retirements constituted nontaxable transfers by ITT to ITT Aetna and ITT Avis, pursuant to section 361,[21] must fail. This is not to say, however, that petitioners are therefore automatically entitled to deduct the losses they realized upon the conversions and retirements. Whether petitioners may recognize their losses depends upon other provisions of the Code and the consolidated return regulations.

We now turn to the questions of the proper treatment of the transactions whereby, in 1965, ITT acquired some of the Aetna and Avis debentures in exchange for ITT stock pursuant to the conversion feature, and, later in 1965, those debentures were retired by ITT Aetna and ITT Avis, respectively. Resolution of these questions depends upon the application of certain provisions of the Internal Revenue Code governing transactions between unaffiliated corporations and the impact thereon of the consolidated return regulations, particularly section 1.1502–41A(b), Income Tax Regs.

The parties have favored us with lengthy and often intricate

---

[20]Cf. Rev. Rul. 54–65, 1954–1 C.B. 101.

[21]Sec. 361(a) provides that "No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, *in pursuance of the plan of reorganization,* solely for stock or securities in another corporation a party to the reorganization." (Emphasis added.) Sec. 361(b)(2), upon which respondent specifically relies, is dependent upon the exchange being pursuant to the plan of reorganization.

arguments as to the applicability of various general provisions of the Code, e.g., secs. 61, 118, 351, 1001, 1012, 1032, and 1232, and some of the regulations thereunder, with which we find it unnecessary to deal. Neither party argues that the exchange by ITT of its stock for the debentures produced any tax consequences to ITT (see sec. 1032) except to the extent that the proper characterization of the exchanges impacts the bases of ITT in the debentures so acquired for the purpose of determining the loss, if any, to which ITT is entitled. The initial focus of the questions before us is the proper tax treatment of the retirements of those debentures by ITT Aetna and ITT Avis, and, in our opinion, section 1.1502–41A(b), Income Tax Regs., is controlling.

Section 1.1502–41A(b), Income Tax Regs., provides as follows:

Sec. 1.1502–41A. Sale and retirement by corporation of its bonds.

(b) *Acquisition of bonds by issuing company.* If a corporation which has been a member of an affiliated group which makes or is required to make a consolidated return, acquires its bonds (whether or not from another member of such group and whether or not during a consolidated return period), gain or loss shall be recognized in the same manner, to the same extent and upon the same conditions as if the corporation had never been affiliated, except that, if such bonds are acquired from another member of the group during a consolidated return period, and in a transaction other than a distribution in a liquidation in which gain or loss to the distributee is recognized pursuant to paragraph (a) of section 1.1502–37A in determining the gain or loss to the issuing company from such acquisition, the basis thereof to such other member of the group shall be deemed the purchase price.

In applying this section, the "except" clause is of critical importance. Much of the discussion of the parties on brief (particularly the discussion contained in petitioners' brief) turns upon a misreading of this clause in that they have ignored the placement of the last comma. As we read this clause, insofar as this case is concerned, the phrase "in determining the gain or loss to the issuing company from such acquisition" is part of the reference to "a distribution in a liquidation in which gain or loss to the distributee is recognized pursuant to paragraph (a) of section 1.1502–37A [Income Tax Regs.]" (a transaction which is concededly not involved herein). Based on the foregoing, we think that, for the purposes of this case, the applicable language of the "except"

clause should be "except that, if such bonds are acquired from another member of the group during a consolidated return period, * * * the basis thereof to such other member of the group shall be deemed the purchase price."[22]

Given our reading of the "except" clause, the basis of the Aetna debentures to ITT[23] is deemed to be the purchase price paid by ITT Aetna. Such being the case, ITT received an amount upon the retirement of the ITT Aetna debentures equal to its basis and therefore realized no gain or loss.[24]

We think our reading of the "except" clause comports with the underlying purpose of section 1.1502–41A(b), Income Tax Regs., namely to eliminate gain or loss from transactions between members of a consolidated group, where the obligation of a member of the group is involved, a purpose which is consistent with the overall objective of the consolidated return provisions of the Code and the regulations thereunder. See *American Packing & Provision Co. v. Commissioner*, 36 B.T.A. 340 (1937). See also *International Telephone & Telegraph Corp. v. United States*, 221 Ct. Cl. 442, ____ , 608 F.2d 462, 468 (1979), and cases cited in note 10 *supra.* Such a reading has the effect of deferring the tax consequences of transactions involving the debt obligations of members of a consolidated group until their acquisition by a member obligated thereon, taking into account at that time the earlier transactions between a member

---

[22]It is possible to argue that sec. 1.1502–41A(b), Income Tax Regs., applies only to the tax consequences to the issuing corporations (in this case, ITT Aetna and ITT Avis, see pp. 81–82 *infra*) and that the applicable sections in determining the tax consequences to ITT are secs. 1.1502–35A and 1.1502–36A, Income Tax Regs., which deal with sales of bonds or other obligations of one member of an affiliated group held by another. But the parties have not framed any issue in this regard, and the record does not contain sufficient information with respect to the conditions which are set forth in those sections. We therefore will not consider the applicability of those sections.

[23]Having decided that the conversions were separate and distinct from the plan of reorganization and keeping in mind that ITT was only obligated in respect of the conversion feature, and not the debt obligation of the debentures, it seems to us clear that the bases to ITT for the Aetna and Avis debentures were the fair market values of the ITT shares given in exchange therefor, as stipulated by the parties—$461,372 for the shares exchanged for the Aetna debentures and $2,125,246 for the shares exchanged for the Avis debentures. Sec. 1012; sec. 1.1032–1(d), Income Tax Regs. Cf. *Simmonds Precision Products, Inc. v. Commissioner*, 75 T.C. 103 (1980). See *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 87 (1973), affd. without opinion 500 F.2d 1400 (3d Cir. 1974). Compare Rev. Rul. 79–155, 1979–1 C.B. 153; Rev. Rul. 72–265, 1972–1 C.B. 222; Rev. Rul. 69–135, 1969–1 C.B. 198.

[24]Similar considerations are involved in respect of the ITT Avis debentures. See pp. 82–85 *infra.*

of the group and outsiders and the tax consequences thereof. Cf. *American Packing & Provision Co. v. Commissioner, supra.* See F. Peel, Consolidated Tax Returns, sec. 14.07 (1st ed. 1959). Thus, the real questions involved herein are what, if any, tax consequences obtain with respect to ITT Aetna and ITT Avis upon the retirement of the debentures—questions that were initially not raised by the parties but on which they finally locked horns in their reply and supplemental reply briefs. Because there are additional considerations involved in respect of the retirement of the Avis debentures (see pp. 82–85 *infra*), we will at this point confine our discussion to the tax consequences to ITT Aetna.

Petitioners argue that we should view the assumption by ITT Aetna as being equivalent to the issuance of its debenture obligations in exchange for the assets of Aetna pursuant to a reorganization and that consequently we should presume that their issue price, i.e., the principal amount, should be used in determining the tax consequences of the retirement thereof by ITT Aetna, citing as authority section 1232(b)(2), and sections 1.163–3(a)(1) and (c)(2), and 1.1232–3(b)(2)(iii), Income Tax Regs. On this basis, petitioners contend that ITT Aetna was entitled to deduct a loss of $35,372, representing the difference between the deemed purchase price paid by ITT Aetna under section 1.1502–41A(b), Income Tax Regs. ($461,372), and the principal amount of the debentures retired ($426,000). Respondent counters that, since there is no evidence of record as to what was received by Aetna on the original issue of such debentures, i.e., whether they were issued for their principal amount, for a lesser amount (at a discount), or for a greater amount (at a premium), we are not in a position to determine the amount of any loss of ITT Aetna, and, therefore, no such loss should be allowed, on the ground that petitioners have failed to carry their burden of proof. Rule 142(a). We agree with respondent.

First, section 1.02 of the first supplemental indenture merely provided that ITT Aetna, by virtue of its assumption of Aetna's debt obligation on the debentures, succeeded to and was substituted for Aetna as if it had been named in the original 1960 indenture. We are not convinced that this provision had the effect for which petitioners contend. Rather, it seems to us that the effect of section 1.02 was to make ITT

Aetna the issuer of *Aetna's* debentures, not to make ITT Aetna the issuer of its own obligations. Second, the authorities upon which petitioners rely are simply not applicable to the instant case. The provisions of section 1232(b)(2) dealing with the issue price of bonds or other evidences of indebtedness issued pursuant to a plan of reorganization apply only to such bonds or other evidences of indebtedness issued after May 27, 1969 (see Pub. L. 91–172, sec. 413(b), 83 Stat. 611), and the regulations upon which petitioners rely deal only with such bonds or other evidences of indebtedness. See sec. 1.1232–3(b)(2)(iii), Income Tax Regs. However, even if the statute were to apply to this situation, we have found that ITT Aetna merely assumed Aetna's liability on Aetna's bonds. Thus, the debentures were not issued pursuant to a plan of reorganization and the last sentence of section 1232(b)(2) does not apply. See also section 1.1232–3(b)(1)(iv), Income Tax Regs., which is cross-referenced in section 1.1232–3(b)(2)(iii), Income Tax Regs. Furthermore, since a pre–1968 taxable year is involved herein, section 1.163–3, Income Tax Regs., by its own terms, does not apply to the debentures retired by ITT Aetna. See sec. 1.163–3(a)(2), Income Tax Regs. Finally, we think that we cannot ignore the impact of section 1.381(c)(9)–1(c) and (d), Income Tax Regs., which implements the carryover to an acquiring corporation of the rights or obligations in respect of amortization of bond discount or premium of an acquired corporation where a C reorganization occurs. See sec. 381(a) and (c)(9). In sum, we hold that ITT Aetna is not entitled to any deductible loss in respect of the retirement of its debentures because petitioners have failed to establish their issue price and, therefore, the amount of the loss, if any. Cf. *Briarcliff Investment Co. v. Commissioner*, 90 F.2d 330 (5th Cir. 1937).

The retirement of the Avis debentures presents a different situation. Here, instead of receiving a cash payment of $923,900 from ITT Avis representing the face amount of the debentures retired, ITT simply increased its capital account in ITT Avis by that amount. Petitioners argue that we should treat the situation as representing two transactions: (1) A payment to ITT by ITT Avis of $923,900, which gives rise to a loss of $1,201,346 to ITT in light of the fact that it paid $2,125,246 for such debentures, and (2) a cash contribution of $923,900 by ITT to the capital of ITT Avis. Alternatively,

petitioners contend that the transaction can be viewed as simply a contribution by ITT of $923,900 to the capital of ITT Avis, with ITT's being entitled to a deduction of the excess of the amount it paid for the debentures. Were we to adopt petitioners' first argument, they could not prevail, due to the provisions of section 1.1502–41A(b), Income Tax Regs.; ITT Avis would be deemed to have paid $2,125,246 on the retirement of its debentures held by ITT and, since that amount also represented ITT's basis in the debentures, ITT is not entitled to any loss. See pp. 79–80 *supra.*

Nor do we think that petitioners' alternative argument can withstand scrutiny. In our opinion, it does not follow that, if the transaction is viewed simply as a contribution of the debentures to ITT Avis, such contribution is necessarily limited to the face amount paid by ITT representing a deductible loss by ITT. To be sure, section 1.61–12(a), Income Tax Regs., implementing section 61(a)(12) of the Code, relating to income from discharge of indebtedness, provides that "if a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation to the extent of the principal of the debt." But that regulation merely acknowledges the exception to section 61(a)(12) provided by section 118 which states that "In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." Neither section 61(a)(12) nor section 118 deals with the tax consequences to the creditor-contributor, much less with those consequences in the consolidated return arena. We think a proper reading of section 1.1502–41A(b), Income Tax Regs. (see p. 79 *supra*), leads to the conclusion that ITT Avis "acquired" the debentures from ITT (another member of the group) and that such acquisition should be deemed a purchase by ITT Avis from ITT at a price equal to ITT's basis. See Landis, "Contributions to Capital of Corporations," 24 Tax L. Rev. 241, 251 (1969). Contra, F. Peel, Consolidated Tax Returns at 225–226 (1st ed. 1959).[25] By virtue of such analysis, ITT

---

[25]Peel, however, relies upon *Commissioner v. AutoStrop Safety Razor Co.*, 74 F.2d 226 (2d Cir. 1934), affg. 28 B.T.A. 621 (1933). That case, which merely held that the gratuitous forgiveness of indebtedness was a capital contribution, was decided in accordance with a general forgiveness-of-indebtedness regulation and did not involve an affiliated group filing a consolidated return.

obviously suffers no loss and, as in the case of the Aetna debentures, the real question becomes what the tax consequences are to ITT Avis on the retirement of the debentures. In our opinion, the same line of reasoning (see pp. 81–82 *supra*) which caused us to conclude that ITT Aetna incurred no deductible loss (including our observations in respect of the burden of proof) applies to ITT Avis.

This application of section 1.1502–41A(b), Income Tax Regs., has the further merit of avoiding the loophole suggested by petitioners on brief—at least in the consolidated return arena—where a parent purchases bonds of its subsidiary at a discount, rather than at a premium, as occurred herein and then contributes the bonds to the subsidiary. In such a case, under our interpretation, the subsidiary would calculate its gain or loss with the basis to the parent, i.e., the discount purchase price, as a starting point.[26]

In light of the foregoing, we have no need to delve into the question of the applicability of section 351 to a contribution to capital where no stock or securities are received in exchange. Compare *Abegg v. Commissioner*, 50 T.C. 145, 160–163 (1968), affd. on other grounds 429 F.2d 1209, 1215–1218 (2d Cir. 1970), with *Commissioner v. Morgan*, 288 F.2d 676, 680 (3d Cir. 1961), revg. 33 T.C. 30 (1959), and *South Texas Rice Warehouse Co. v. Commissioner*, 43 T.C. 540, 569 (1965), affd. on this issue sub nom. *Davant v. Commissioner*, 366 F.2d 874, 886–887 (5th Cir. 1966). See also Ruby, "Abegg case hands tax men a 351 trap and vexing interpretative problems," 33 J. Tax. 100 (1970).

*Decision will be entered under Rule 155.*

---

[26]We express no opinion as to the tax consequences to the parent (or the subsidiary) outside of the consolidated return arena. We note, however, that "the law relating to consolidated returns is unique. It is designed to coordinate the details of treating several corporations as a tax unit." *Covil Insulation Co. v. Commissioner*, 65 T.C. 364, 375 (1975). In the instant case, the ITT Group may have realized a gain or loss (depending on the issue price of the debentures) when the bonds were retired. Sec. 1.1502–41A(b), Income Tax Regs., assures that such gain or loss of the unit will be recognized. See *American Packing & Provision Co. v. Commissioner*, 36 B.T.A. 340 (1937).